UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| FLANDREAU SANTEE SIOUX TRIBE, A FEDERALLY-RECOGNIZED INDIAN TRIBE;<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD L. SATTGAST, TREASURER OF THE STATE OF SOUTH DAKOTA; ANDY GERLACH, SECRETARY OF REVENUE OF THE STATE OF SOUTH DAKOTA; AND DENNIS DAUGAARD, GOVERNOR OF THE STATE OF SOUTH DAKOTA;<br><br>Defendants. | 4:17-CV-04055-KES<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING IN PART AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN PART BUT DISMISSING PLAINTIFF'S FOURTH CLAIM WITHOUT PREJUDICE |

Plaintiff, Flandreau Santee Sioux Tribe, filed this action against defendants Richard L. Sattgast, Andy Gerlach, and Dennis Daugaard seeking a judicial declaration that, under federal law, the State of South Dakota does not have the authority to impose the State's excise tax in connection to services performed by non-Indian contractors in the Tribe's on-reservation construction project. Docket 1. Plaintiff and defendants move for summary judgment. Docket 31; Docket 66.

**FACTUAL BACKGROUND**

The undisputed facts[1] are:

---

[1] The undisputed facts are derived from the parties' submitted briefs, attachments, oral arguments, and the portions of the statements of undisputed material facts that are either not disputed or not subject to genuine dispute. Where the facts are disputed, both parties' averments are included.

The Flandreau Santee Sioux Tribe is a federally recognized Indian tribe. Docket 32 at 2; Docket 75 at 10. The Flandreau Indian Reservation is wholly located in Moody County, South Dakota. Docket 32 at 2. The Tribe owns and operates the Royal River Casino on the reservation. Docket 32 at 2; Docket 75 at 11. The State and the Tribe entered into a Tribal-State gaming compact under the Indian Gaming Regulatory Act (IGRA) that took effect on September 14, 2016. Docket 72-14. IGRA regulates Class III gaming activities at the Royal River Casino. Docket 32 at 2; Docket 75 at 11-12. The compact does not contain provisions specifically relating to construction standards, construction activities, or the taxation of construction activities at the casino. Docket 32 at 2; Docket 75 at 13. Casino revenue comprises approximately forty percent of the Tribe's income. Docket 75 at 12-13. Federal funding accounts for approximately fifty-two percent of the Tribe's income. *Id.* at 13. The Tribe also utilizes proceeds from the casino to help fund off-reservation projects in the local community including donations to the local school and fire department.

The Tribe first opened the casino in 1990 and relocated it to the present building in 1997. Docket 75 at 11. Casino gaming amenities used or consumed at the casino by gaming patrons include: hotel rooms, alcoholic drinks consumed on the gaming floor and at the bar, concert tickets, and food eaten at the restaurant, on the gaming floor, and at the snack bar. Docket 77 at 35. The Tribe decided to invest in a $24 million renovation and expansion of the casino. Docket 32 at 2. The project includes doubling the number of slot machines, adding a VIP lounge, renovating the casino cage area, relocating the

bar, and renovating the snack bar, restaurant, and hotel. Docket 75 at 14-15. The Tribe retained Leo A. Daly as the architectural firm and Henry Carlson Company as the general contractor. Docket 32 at 2.

Under SDCL § 10-46A-1, a contractor's gross receipts are subject to a two percent excise tax. SDCL § 10-46A-1. The excise tax is deposited into the general fund. The general fund is used for a number of services, but for purposes of this case, the State points out that the general fund is used for professional licensing such as attorneys, electricians, plumbers, and notaries, and for the supervision of parolees. Certain construction projects within Indian country are exempt under federal law. Docket 32 at 3. The South Dakota Department of Revenue requires contractors to complete an "Indian Country Project Request for Exemption" form to receive an exemption from the tax. *Id.* at 3. The Department of Revenue denied requests by the Tribe and its construction manager for an exemption for the casino construction project. Docket 75 at 15-16. As a result, Henry Carlson has paid contractor's excise tax under protest consistent with SDCL § 10-27-2. Docket 32 at 4; Docket 75 at 16. Henry Carlson's protest letters requested that the state issue refunds to the Tribe as the entity who paid the cost of taxes. Docket 75 at 16. The Tribe seeks to have a judicial declaration that the State does not "have the authority to impose the State's contractor's excise tax" and seeks a refund of the "contractor's excise tax paid, or to be paid, under protest." Docket 1. Currently, the Tribe estimates that the contractor's excise tax on the project will be approximately $480,000.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). "[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.' " *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992) (quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). On a motion for summary judgment, the facts and inferences drawn from those facts are "viewed in the light most favorable to the party opposing the motion."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**DISCUSSION**

## I.     Per se Invalidity

"The initial and frequently dispositive question in Indian tax cases . . . is who bears the legal incidence of a tax." *Okla. Tax Comm'n v. Chicksaw Nation*, 515 U.S. 450, 458 (1995). "If the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization." *Id.* at 459. But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax[.]" *Id.* Here, the legal incidence of the tax is on the non-Indian contractor because under South Dakota law, the contractor has the legal obligation to pay the contractor's excise tax. *See* SDCL § 10-46A-1. As a result, the state is not categorically barred from imposing its tax and the tax is not per se invalid.

## II.     Barriers to State's Exercise of Taxing Authority

"More difficult questions arise where, as here, a state asserts authority over the conduct of non-Indians engaging in activity on the reservation." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980). There are two potential "barriers" to the state's exercise of authority to tax non-Indian on-reservation activity. *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 837 (1982). "First, the exercise of such authority may be pre-empted by federal law." *Bracker*, 448 U.S. at 142. "Second, it may unlawfully

infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' " *Id.* (quoting *Williams v. Lee*, 358 U.S. 217, 220 (1959)). These barriers are "independent but related." *Id.*

> The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop' . . . against which vague or ambiguous federal enactments must always be measured.

*Id.* at 143 (quoting *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172 (1973)).

### A. Pre-Emption by Federal Law—IGRA

#### 1. Comprehensive regulation of Indian gaming

The Tribe argues that IGRA pre-empts the State's authority to impose an excise tax. "[I]n examining congressional intent, the history of tribal sovereignty serves as a necessary 'backdrop' to that process." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176 (1989) (quoting *McClanahan*, 411 U.S. at 172. "As a result, questions of pre-emption in this area are not resolved by reference to standards of pre-emption that have developed in other areas of the law, and are not controlled by 'mechanical or absolute conceptions of state or tribal sovereignty.' " *Id.* (quoting *Bracker*, 448 U.S. at 145.) "Instead, we have applied a flexible pre-emption analysis sensitive to the particular facts and legislation involved. Each case 'requires a particularized examination of the

relevant state, federal, and tribal interests.' " *Id.* (quoting *Ramah*, 458 U.S. at 838).

In *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), the United States Supreme Court held that California's gaming regulations were pre-empted by tribal and federal interests. *Id.* As a result, Congress passed IGRA "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1). IGRA also "provide[s] a statutory basis for the regulation of gaming by an Indian tribe" and "declare[s] that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue." *Id.* § 2702(2)–(3). "Any claim which would directly affect or interfere with a tribe's ability to conduct its own [gaming] licensing process should fall within the scope of [IGRA's] complete preemption." *Casino Res. Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435, 437 (8th Cir. 2001) (alterations in original) (quoting *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 549 (8th Cir. 1996)).

Under IGRA, "[a]n Indian tribe may engage in, or license and regulate" class III[2] gaming on Indian land if the tribe's governing body adopts a resolution approved by the Chairman of the NIGC. 25 U.S.C. § 2710(b)(1). The Chairman must approve a tribal resolution that provides for "the construction and maintenance of the gaming facility, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety[.]" *Id.* § 2710(b)(2)(E). The Tribe must certify to the NIGC that the gaming facilities meet the standards set forth in IGRA and the Chairman may inspect the Tribe's documentation and can close the casino if the casino fails to meet the appropriate standards. *See* 25 U.S.C. § 2713; 25 C.F.R. §§ 559.3–6.

In *Bracker,* the United States Supreme Court found that the federal government's comprehensive and pervasive regulations of tribal logging and tribal roads pre-empted Arizona's motor carrier license and excise taxes. *Bracker,* 448 U.S. at 148. The Court reasoned that the taxes interfered with the federal objective of guaranteeing tribes the profit from timber sales. *Id.* at 149. Also, the Court stated that the tax undermined the Secretary of Interior's duties and the tribe's ability to comply with several federal sustained yield policies. *Id.* at 149-50.

---

[2] 25 U.S.C. § 2710(b) relates to the regulation of class II gaming. But § 2710(d)(1)(A)(ii) clarifies that class III gaming activities must also meet the requirements set forth in § 2710(b).

In *Ramah Navajo School Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982), the State of New Mexico sought to impose a gross receipts tax on a non-Indian construction company for the construction of a tribal school on the reservation. *Id.* at 835-36. The United States Supreme Court found that the federal government's regulation of Indian educational institutions is "comprehensive and pervasive" because Congress has enacted numerous statutes regulating Indian education and the Secretary of the Interior promulgated comprehensive rules for school construction and operation. *Id.* at 839-42. And the Court further stated that "the State [did] not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax." *Id.* at 843. Thus, the Court ruled that "the comprehensive federal regulatory scheme and the express federal policy of encouraging tribal self-sufficiency in the area of education preclude the imposition of the state gross receipts tax[.]" *Id.* at 846-47.

In *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184 (9th Cir. 2008), the Ninth Circuit Court of Appeals found that California could impose a sales tax on purchases made for casino renovations. *Id.* at 1192. In *Yee*, the tribe engaged in a renovation of its casino on tribal lands. *Id.* at 1187. As part of the contract with the contractor, the tribe and the contractor devised language that circumvented state sales tax by scheduling deliveries to occur on tribal lands. *Id.* So the "parties contracted to create a taxable event on Indian territory which otherwise would occur on non-Indian territory[.]" *Id.* at 1191.

The Ninth Circuit stated that the courts looked unfavorably on "tribal manipulation of tax policy" and reasoned that the case was distinguishable from "the multitude of cases where courts have analyzed state taxation on non-Indians performing work on Indian land. *Id.* at 1190-91. Thus, the Ninth Circuit found that California could impose its sales tax because the tribe engaged in tax manipulation by marketing a tax exemption to third parties. *Id.* at 1193.

Here, similar to *Ramah* and *Bracker*, Congress created a comprehensive and pervasive regulatory scheme with the explicit intent of providing tribal governments with revenue and the ability to be self-sufficient. IGRA not only regulates gaming operations, but it also requires the Tribe to adopt a tribal resolution for the construction and maintenance of the gaming facility that is subject to approval by the Chairman of NIGC. 25 U.S.C. § 2710(2)(E). And unlike *Yee*, the Tribe did not engage in tax manipulation and the Tribe is a party to the transaction subject to the tax. The State's excise tax undermines the objective of IGRA because the tax is passed from the contractor to the Tribe which interferes with the Tribe's ability to make a profit from gaming activities. Thus, Congress intended for IGRA to completely regulate Indian gaming and there is no room for the State's imposition of an excise tax.

### 2. Renovation of casino falls under the catchall provision

Alternatively, the Tribe argues that under either § 2710(d)(3)(C)(vi) or the catchall provision in § 2710(d)(3)(C)(vii) IGRA pre-empts the excise tax. Sections 2710(d)(3)(C)(vi)-(vii) provide that any Tribal-State compact negotiated

under § 2710(d)(3)(A) "may include provisions relating to[:] . . . (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and (vii) any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vi)-(vii).

This court has previously adopted the analysis set forth in *In re Indian Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003) (*Coyote Valley II*), to determine whether something falls within IGRA's catchall provision. *See Flandreau Santee Sioux Tribe v. Gerlach*, 269 F. Supp. 3d 910, 923-24 (D.S.D. 2017), *appeal docketed*, No. 18-1271 (8th Cir. Feb. 6, 2018). Based on the opinion in *Coyote Valley II*, an activity falls within the catchall provision if, but for the tribal gaming, the activity would not exist, and if the Tribe could not operate its gaming activities without the activity. *See Coyote Valley II*, 331 F.3d at 1116. To fully analyze whether IGRA pre-empts the State's tax under *Coyote II*, a brief history and explanation of IGRA provides the court with guidance. But IGRA grants states "a power that they would not otherwise have, viz., some measure of authority of gaming on Indian lands[]" through the utilization of a tribal-state gaming compact. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (1996). The Eighth Circuit Court of Appeals has previously explained "that Congress intended [IGRA to] completely preempt state law." *Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996). And the court has stated that "[t]he only avenue for significant state involvement is through tribal-state compacts covering class III gaming." *Id.* "Congress left the states without a significant role under IGRA unless one is

negotiated through a compact." *Id.* at 547. IGRA provides a list of subjects that a tribal-state compact may address. 25 U.S.C. § 2710(d)(3)(C). Section 2710(d)(4) states that IGRA shall not "be interpreted as conferring upon a State . . . authority to impose any tax . . . upon an Indian Tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." 25 U.S.C. § 2710(d)(4). Thus, if a compact does not address an area that is listed in § 2710(d)(3)(C), then the state does not have authority to regulate it. *Gaming Corp.*, 88 F.3d at 547.

As stated above, the Tribe argues that the State's excise tax falls within the catchall provision in § 2710(d)(3)(C)(vii), namely "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii). The first question in the *Coyote II* analysis presents a clear answer. If no casino existed, then there would not be a need to renovate the casino. Thus, the construction project would not exist but for the Tribe's gaming activities. The second question requires a more nuanced analysis. Congress iterated in IGRA that the intention of IGRA was to utilize the proceeds of tribal gaming to encourage "tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1). And the Tribe is required under IGRA to maintain the "construction and maintenance of the gaming facility." 25 U.S.C. § 2710(b)(2)(E).

Here, the casino's profits currently make-up approximately forty percent of the Tribe's income. Docket 77 ¶ 9. The Tribal government's finance department, legal department, and the Tribal Executive Committee are all

funded with federal and tribal funds. Docket 77 ¶ 13. The casino was built in 1997 and the casino floor has not been renovated since that time. Docket 77 ¶ 149. In 2011, a new and larger casino was built in nearby Larchwood, Iowa, which is the casino's first major nearby competitor. Docket 77 ¶ 125. Thus, to stay competitive and maintain the building, the Tribe must renovate the casino. Updating the interior of the building and adding additional slot machines is a necessary expense in order to compete with bigger, newer casinos in the area and to attract patrons. If the Tribe failed to update the casino and let it fall into disrepair, patrons would go elsewhere for gaming, and the Tribe would risk a casino closure if the Chairman of the NIGC determined that the Tribe failed to maintain the appropriate standards. *See* 25 U.S.C. § 2713; 25 C.F.R. §§ 559.3–4; 25 C.F.R. § 559.6. Thus, without the construction project, the Tribe would be unable to operate its gaming activities. Because the excise tax is a subject that falls within IGRA's catchall provision and it was not included in the Tribal-State compact, the State cannot impose the contractor's excise tax on the casino construction project.

### B. Infringement on Right of Indians to Make Their Own Laws

The Tribe also argues that the excise tax unlawfully infringes "on the right of reservation Indians to make their own laws and be ruled by them." *Bracker*, 448 U.S. at 142 (quoting *Williams*, 358 U.S. at 220). The State contends that the excise tax helps fund services that Henry Carlson Company and the Tribe utilize, so the tax is not pre-empted. Generally, a state does not have regulatory power over the on-reservation conduct by Indians. *Bracker*,

448 U.S. at 144. Where the state asserts authority over the conduct of non-Indians on the reservation, the court engages in a "particularized inquiry into the nature of the state, federal, and tribal interests at stake, [and] . . . determine[s] whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 145. The Supreme Court has repeatedly stated that there is "a firm federal policy of promoting tribal self-sufficiency and economic development." *Id.* at 143. "Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Id.* at 143-44. The "regulatory interest of the State must be given weight," but a "general desire to raise revenue" is insufficient. *Id.* at 144, 150. "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *Casino Res. Corp.*, 243 F.3d at 437 (quoting *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983)).

Courts have consistently expressed a strong federal interest in regulating gaming activity so as to encourage economic development on Indian reservations. In *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 785 F.3d 1207, 1211 (8th Cir. 2015), the Eighth Circuit Court of Appeals stated that "IGRA explicitly defined the policies and goals which led to its enactment. Congress indicated that its intent upon passing IGRA was 'to provide a statutory basis for the regulation of gaming by an Indian tribe

adequate . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation.' " *Id.* at 1211 (quoting 25 U.S.C. 2702(2)). This desire to ensure that the Tribe is the primary beneficiary of the gaming operations originates from the text of IGRA itself, which states that IGRA's purpose is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1).  "Congress has noted that for tribes, gaming income 'often means the difference between an adequate governmental program and a skeletal program that is totally dependent on Federal funding.' " *City of Duluth*, 785 F.3d at 1211 (quoting S. Rep. No. 100-446, at 3 (1988)).

As discussed above, the Supreme Court found in *Ramah* that New Mexico's imposition of a gross receipts tax on the construction of a tribal school interfered with the tribe's ability to regulate its own school. *Ramah*, 458 U.S. at 846. The Court noted that New Mexico did not provide any services to the tribe that were funded by the tax and reasoned that because the state "declined to take any responsibility for the education of these Indian children, the State is precluded from imposing an additional burden on the comprehensive federal scheme intended to provide this education—a scheme which has 'left the State with no duties or responsibilities.' " *Id.* at 843 (quoting *Warren Trading Post Co. v. Arizona State Tax Comm'n*, 380 U.S. 685, 691 (1965)).  Thus, the Court ruled that New Mexico's gross receipts tax was pre-empted. *Id.* at 846-47. In *Bracker,* the Supreme Court also found that

Arizona's general desire to raise revenue without "a responsibility or service that justifies the assertion of taxes imposed for on-reservation operations conducted solely on tribal and Bureau of Indian Affairs roads" was not sufficient to overcome the tribal and federal interests. *Bracker*, 448 U.S. at 150.

In *Marty Indian School Board, Inc. v. State of South Dakota*, 824 F.2d 684 (8th Cir. 1987), the State of South Dakota sought to impose a motor fuel tax on fuel the school purchased from non-Indian Weisser Oil Company. *Id.* at 685. The Eighth Circuit Court of Appeals, applying the *Bracker* test, found that there is a strongly expressed policy in favor of developing Indian-controlled educational opportunities "tailored to the needs and goals of the Indian people." *Id.* at 687. The court quoted from *Ramah*, where the Supreme Court reasoned that "[t]he Self-Determination Act declares that a 'major national goal of the United States is to provide the quantity and quality of education services and opportunities which will permit Indian children to compete and excel in the life areas of their choice[.]' " *Id.* (quoting 25 U.S.C. § 450a(c). Applying the logic from *Ramah*, the Eighth Circuit stated that the Yankton Sioux Tribe sought to "promote Indian self-determination by creating and operating an Indian school . . . operated exclusively by members of the Tribe[,] . . . which offer[ed] classes specifically designed for Indian students[.]" *Id.* (citation omitted). In contrast, the State of South Dakota's revenues from the tax were used to maintain roads and were not used for the benefit of educating Indian children. *Id.* at 688. Thus, the Eighth Circuit found that "the strong federal

policy of promoting Indian self-determination and education and the pervasive involvement of the federal government" left "no room for the additional burden which the state's tax would impose." *Id.*

Here, the excise tax is deposited in the State's general funds and the Department of Revenue's Business Tax Division. Docket 77 ¶ 281. The State argues that the general fund goes toward a variety of services that benefit the Tribe and Henry Carlson Company such as the licensing of attorneys, electricians, plumbers, and notaries and the supervision of parolees. The State relies on *Cotton Petroleum Corp.*, 490 U.S. at 163 and *Yee*, 528 F.3d at 1185 to support its contention that the excise tax does not interfere with the Tribe's ability to govern itself.

In *Cotton Petroleum Corp.*, the United States Supreme Court found that New Mexico's tax on a company's on-reservation oil and gas production was permissible under the *Bracker* analysis. 490 U.S. at 186-87. First, the Court stated that, historically, states were expressly permitted to tax oil and gas production on reservations. *Id.* at 182 ("There is, accordingly, simply no history of tribal independence from state taxation of these lessees to form a 'backdrop' against which the 1938 Act must be read."). And the Court noted that Congress' most recent act—the Indian Mineral Leasing Act of 1938—was silent as to whether states' express permission to tax such activity remained in effect. *Id.* Thus, there was not a strong federal interest in preventing a state's taxation of on-reservation oil and gas production.

Second, the Court compared New Mexico's tax on oil and gas production to the taxes in *Bracker* and *Ramah* and found that the tax in *Cotton* was distinguishable. *Id.* at 184-85. The Court reasoned that New Mexico provided substantial services to the tribe and to the oil company. *Id.* at 185. And unlike the states in *Bracker* and *Ramah* where "both cases involved complete abdication or noninvolvement of the State in the on-reservation activity[,]" New Mexico was involved in the on-reservation activity of oil and gas. *Id.* Thus, the Court found that Congress had expressed minimal interest in preventing state taxes on oil and gas and New Mexico had maintained a strong interest in the oil and gas production because of the services New Mexico provided to the oil company and to the tribe.

In *Yee*, the tribe engaged in tax manipulation by contracting with non-Indian third parties to have materials delivered on the reservation even though the seller and buyer of the materials were both non-Indians. *Yee*, 528 F.3d at 1191. The Ninth Circuit rejected the argument that the sales tax was pre-empted by IGRA because "IGRA's comprehensive regulation of Indian gaming does not occupy the field with respect to sales taxes imposed on third-party purchases of equipment used to construct the gaming facilities." *Id.* at 1193. Thus, because the tribe engaged in tax manipulation and the sales tax was imposed on a transaction between two non-Indian parties, the Ninth Circuit found that the tax was not pre-empted by IGRA. *Id.*

The State also relies on *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980), to argue that the State can impose

taxes on non-Indians doing business on a reservation. In *Colville*, the United States Supreme Court found that Washington's tax on cigarettes sold to non-Indians on the reservation was permissible because the tribal cigarette sellers were only in business to offer an exemption to off-reservation customers. *Id.* at 155. The Court stated that tribal interests are "strongest when the revenues are derived from value generated on the reservation by activities involving the Tribes and when the taxpayer is the recipient of tribal services." *Id.* at 156-57. And the Court stated that it did "not believe that principles of federal Indian law . . . authorize Indian tribes [] to market an exemption from state taxation to persons who would normally do their business elsewhere." *Id.* at 155. Thus, Washington's interest in taxing non-members who would otherwise purchase cigarettes off-reservation was stronger than the tribe's general interest in creating a tax exemption.[3]

Here, unlike in *Yee* and *Colville*, the Tribe has not engaged in any tax manipulation and the Tribe is the entity ultimately responsible for paying the tax, thus it is involved in the transaction being taxed. In *Yee*, the tribe set up a system whereby two non-Indian parties would avoid paying California sales tax by delivering the goods to the reservation. The court found that the tax was not pre-empted because tax manipulation was the reason the on-reservation

---

[3] Similarly, in *Yee*, the Ninth Circuit found that California's sales tax was valid under *Bracker* where the tribe invited "the non-Indian subcontractor to theoretically consummate purchases on its tribal land for the sole purpose of receiving preferential tax treatment. *Barona Band of Mission Indians v. Yee*, 528 F.3d 1184, 1191 (9th Cir. 2008).

delivery system was set up and the Tribe was not a party to the transaction. And in *Colville*, the Indian cigarette retail sellers were marketing a tax exemption to non-Indian cigarette buyers who would otherwise have been subject to the state tax. Here, the Tribe has not engaged in any tax manipulation[4] and the Tribe is a party to the transaction being taxed. Also, this case is distinguishable from *Cotton* because the State does not provide substantial services to the Tribe or Henry Carlson Company. At oral argument the State argued that services such as licensing for attorneys, notaries, electricians, and plumbers, and the supervision of parolees were services that benefit the Tribe and Henry Carlson Company.

The court finds that argument unpersuasive. The attorneys, electricians, plumbers, and notaries involved in the renovation project maintain licenses in South Dakota for their own general purposes and did not become licensed specifically for this project. Further, the State supervises parolees as a service to all citizens in South Dakota and there is not any evidence in the record that there is a parolee currently working for Henry Carlson Company on the casino renovation project. All of the services identified by the State are services provided to the general population of the State of South Dakota and not specific to this project. There is no evidence that the State incurred additional costs specifically related to this project. In fact, the evidence indicates that the costs of inspection and supervision of the project are born by the Tribe. Thus,

---

[4] When asked during oral argument whether there was any evidence of tax manipulation by the Tribe, the State of South Dakota answered, "No."

the court finds that the State's tax infringes on the Tribe's ability to govern itself because there is not a nexus between State services and the excise tax and the Tribe has not engaged in manipulation of tax policy.

In conclusion, the court finds that both barriers to the State's exercise of authority are present here. The excise tax is pre-empted by federal law by IGRA. Also, the State's interests in imposing the excise tax do not outweigh the tribal and federal interests in promoting self-sufficiency because there is not a nexus between any services the State provides to the Tribe or the contractor and the imposition of the excise tax. Either barrier, on its own, is sufficient to find that state authority inapplicable. *Bracker*, 448 U.S. at 143. Thus, the court finds that the State's excise tax is inapplicable.

Because the court finds in favor of the Tribe under both prongs of the *Bracker* analysis, it does not reach the other theory raised by the Tribe— namely whether the Indian Trader Statutes pre-empt the State's ability to impose the contractor's excise tax.

## III.    Refund

The State argues that this court does not have jurisdiction to grant the Tribe's claim for a refund of the tax paid in protest because the Eleventh Amendment only permits tribes to obtain prospective relief from state officials. Docket 32 at 6. The State acknowledges, however, that a suit for monetary damages against the State may proceed where the suit is "brought by the United States on behalf of [the Tribe.]" *Id.* at 7. Given the State's assertion of sovereign immunity, "the Tribe concedes that the Court does not have

jurisdiction to grant the relief sought in the Tribe's fourth claim." Docket 81 at 44. Thus, the Tribe's fourth claim for relief is dismissed, without prejudice, for lack of jurisdiction.

## CONCLUSION

In conclusion, IGRA pre-empts the State's excise tax because IGRA comprehensively and pervasively regulates Indian gaming, and alternatively, because there would not be a renovation project without the casino and the casino needs the renovation project to operate. Also, the federal and tribal interest in promoting tribal self-sufficiency through Indian gaming outweigh the State's interest in raising revenue for the general fund. And the Tribe's claim for a refund of the tax is dismissed due to lack of jurisdiction. Thus, it is

ORDERED that defendants' motion for summary judgment (Docket 31) as to plaintiff's first, second, and third claims is DENIED; it is

FURTHER ORDERED that plaintiff's motion for summary judgment as to its first, second, and third claims (Docket 66) is GRANTED; it is,

FURTHER ORDERED that plaintiff's fourth claim is DISMISSED for lack of jurisdiction; and it is

FURTHER ORDERED that plaintiff's motion for a preliminary injunction (Docket 91) is DENIED as moot.

Dated July 16, 2018.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE