UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| FLANDREAU SANTEE SIOUX TRIBE, A FEDERALLY-RECOGNIZED INDIAN TRIBE,<br><br>          Plaintiff,<br><br>   vs.<br><br>JAMES TERWILLIGER, SECRETARY OF REVENUE OF THE STATE OF SOUTH DAKOTA, AND KRISTI NOEM, GOVERNOR OF THE STATE OF SOUTH DAKOTA,<br><br>          Defendants. | 4:17-CV-04055-KES<br><br><br><br>MEMORANDUM OPINION AND ORDER |

TABLE OF CONTENTS

PROCEDURAL HISTORY .................................................................... 3

DISCUSSION ...................................................................................... 5

   I. FINDINGS OF FACT.................................................................... 5

      A. Gaming Compact ................................................................ 6

      B. Royal River Casino Renovation ........................................... 6

      C. During-Renovation Services ................................................ 9

      D. Tribal, Federal, and State Project Licensing........................... 9

      E. South Dakota Contractor's Excise Tax.................................. 13

      F. Tribal Revenue and Expenditures ....................................... 16

      G. Indian Trader Statutes...................................................... 20

   II. LEGAL CONCLUSIONS............................................................ 21

      A. Per Se Invalidity .............................................................. 21

      B. Express or Implied Preemption Under IGRA ........................ 21

      C. Preemption Under *Bracker* Balancing Test- IGRA ................. 24

         1. History of Tribal Sovereignty and Federal Interests......... 35

            a. Extent of Federal Regulation and Control: Protecting the Environment, Ensuring Public Health and Safety, and Promoting Tribal Self-Sufficiency and Strong Tribal Government................................................ 39

            b. Promoting Tribal Economic Development, Ensuring that the Tribe is the Primary Beneficiary of Gaming, and Protecting Gaming as a Means of General Tribal Revenue ................................................................ 52

         2. Tribal Interests .......................................................... 65

            a. Economic Burden of the State Tax ......................... 65

            b. Tribal Sovereignty and Self-Determination ........... 67

            c. Tribal Economic Development .............................. 72

         3. State Interests ............................................................ 72

            a. Reimbursement for State Government Services .... 73

            b. Raising Revenue for the General Fund ................. 87

            c. Uniform Application of South Dakota Tax Law ..... 91

         4. Conclusion................................................................ 98

      D. Express Preemption Under Indian Trader Statutes............... 100

      E. Preemption Under *Bracker* Test- Indian Trader Statutes....... 112

         1. Federal and Tribal Interests ....................................... 112

          2. State Interests .......................................................... 118

          3. Conclusion................................................................ 119

CONCLUSION ................................................................................ 120

Plaintiff, Flandreau Santee Sioux Tribe, filed this action against defendants, Richard L. Sattgast, Andy Gerlach, and Dennis Daugaard seeking a judicial declaration that, under federal law, the State of South Dakota does not have the authority to impose the South Dakota excise tax in connection with services performed by non-Indian contractors on the Tribe's on-reservation construction project. Docket 1. James Terwilliger and Kristi Noem were substituted as defendants. Dockets 159, 165. A court trial was held beginning on June 23, 2020. Docket 167.

## PROCEDURAL HISTORY

In 2018, this court granted the Tribe's motion for summary judgment on cross-motions for summary judgment and entered judgment for the Tribe. Dockets 102, 103. The court granted the Tribe's motion and entered judgment on the Tribe's federal preemption claim under the Indian Gaming Regulatory Act (IGRA). Docket 102 at 21-22.  Having found in favor of the Tribe "under both prongs of the *Bracker* analysis," the court did not analyze the Tribe's Indian Trader Statute claim. *Id.* The court also dismissed the Tribe's refund claim as barred by the State's Eleventh Amendment immunity. *Id.* Defendants filed a timely appeal to the Eighth Circuit Court of Appeals. Docket 108. On September 6, 2019, the Eighth Circuit reversed and remanded. Dockets 121, 122; *see also Flandreau Santee Sioux Tribe v. Haeder*, 938 F.3d 941 (8th Cir. 2019).

In its opinion, the Eighth Circuit concluded that this court erred in ruling that the imposition of the South Dakota excise tax was expressly

preempted under IGRA. *Haeder*, 938 F.3d at 945; *see also* Docket 121. The Eighth Circuit also held that based on the evidence before the court at the summary judgment stage, this court erred in concluding that the *Bracker* balancing factors tipped in favor of preempting the State excise tax. *Haeder*, 938 F.3d at 945-47. The Eighth Circuit granted defendants' motion to dismiss the State Treasurer and remanded the case for further proceedings consistent with the opinion. *Id.* at 947.

At a status conference on November 25, 2019, defendants argued that following the Eighth Circuit opinion there were no material facts in dispute. Docket 126. The Tribe disagreed, arguing that there were material facts still at issue, notably the economic impact the State excise tax had on the Royal River Casino's ability to operate Class III gaming under IGRA and generate revenue. *Id.* The Tribe also argued that material issues of fact and law remained on the Indian Trader Statutes' issue that was not decided at the summary judgment stage or on appeal. *Id.* The court agreed with the Tribe, finding that at the summary judgment stage, the court weighed the evidence in the light most favorable to the non-moving party, but at trial the court does not weigh the evidence in a light favorable to either party. *Id.* Thus, a court trial was scheduled to proceed consistent with the Eighth Circuit opinion.

## DISCUSSION

### I.   FINDINGS OF FACT

The following constitutes the court's findings of fact under Federal Rule of Civil Procedure 52(a)(1), which were found by a preponderance of the evidence:

The Flandreau Santee Sioux Tribe is a federally recognized Indian tribe. Docket 149-1 ¶ 1. The Flandreau Indian Reservation is wholly located in Moody County, South Dakota. *See* Scott Anderson Testimony.[1] The Tribe owns and operates the Royal River Casino on the reservation. Docket 149-1 ¶ 2; Docket 149-2 at 1. The Tribe has adopted a Class II and Class III Gaming Ordinance that was approved by the National Gaming Commission. Docket 149-1 ¶¶ 3-4; *see also* Ex. 1-4. The Tribe's Class II Gaming Ordinance provides that "the Tribe shall issue a separate license to each place, facility, or location on Indian lands where Class II gaming is conducted under this Ordinance." Docket 149-1 ¶ 9. This Class II Gaming Ordinance requires that "Class II gaming facilities shall be constructed, maintained, and operated in a manner that adequately protects the environment and the health and safety of the public." *Id.* ¶ 11. The Tribe's Class III Gaming Ordinance requires that "[n]o facility will be granted a license unless such facility is constructed, maintained and operated in a manner that adequately protects the environment and the public health and safety." *Id.* ¶ 10.

---

[1] Because a trial transcript was not ordered by the parties, the court will refer in general to the testimony of the person who testified about the facts upon which the court relies.

## A. Gaming Compact

As required by IGRA, the State and the Tribe entered into a Tribal-State Gaming Compact that was approved by the United States Department of Interior and took effect on September 14, 2016. Docket 149-1 ¶¶ 23-24; *see also* Ex. 5, 17-18. IGRA regulates Class III gaming activities at the Royal River Casino. *Haeder*, 938 F.3d at 943; *see* 25 U.S.C. § 2710(d). The compact made certain changes from the Gaming Compact previously in effect, including increasing the number of slot machines the Tribe is authorized to operate from 500 machines to 1,000 machines. Docket 149-1 ¶ 25. The Compact does not contain provisions specifically relating to state regulation of construction or renovation at the casino. *Id.* ¶ 26. Article 11.2 of the Gaming Compact requires the Tribe to make an annual contribution to Moody County "due to the possibility of increased governmental demand . . . for government services" in increasing amounts according to the number of Class III slot machines in operation during the previous year: $75,000.00 for 500-699 machines; $150,000.00 for 700-849 machines; $250,000.00 for 850-999 machines; and $350,000 for 1,000 machines. *Id.* ¶ 27.

## B. Royal River Casino Renovation

The Tribe first opened the Casino in 1990 and relocated it to the present building in 1997. *Haeder*, 938 F.3d at 943. The Tribe decided to invest over $18 million into the renovation and expansion of the Casino. Reider Testimony. This was in part due to the need to compete with a newer, larger, nearby casino in Larchwood, Iowa that opened in 2011. Morrissey and McDermott Testimony.

The renovation project planned to include the following improvements: (a) expand the gaming floor; (b) upgrade the Casino's overall electrical system to accommodate additional slot machines; (c) replace the Casino roof; (d) replace the Casino's HVAC system; (e) renovate and update the Casino's finishes and fixtures; (f) relocate and replace the Casino's bar and lounge to the middle of the gaming floor; (g) add a VIP gaming lounge with gaming and food, beverage, and bar service; (h) renovate the casino cage area, snack bar, restaurant; (i) renovate the hotel, hotel lobby, and corridor connecting the gaming floor and hotel; and (j) construct a new administration building to house the Casino's operation departments. Docket 149-1 ¶ 38; *see also* Ex. 32-33. The project planned to provide the Casino gaming floor with the capacity of approximately 800 slot machines. Docket 149-1 ¶ 39. When the renovation project started, the Tribe operated 425 Class III slot machines and 11 table games at the Casino. *Id.* ¶ 31. If not for the Casino, the construction renovation project would not take place at the Casino location. *Id.* ¶ 32.

In 2015, the Tribe contracted with Henry Carlson Company as the general contractor and construction manager for the Casino renovation project. Docket 147 ¶ 1; Docket 149-1 ¶ 33; *see also* Ex. 23-24. The contract with Henry Carlson Company was amended several times during the renovation project with Tribal approval. Docket 149-1 ¶ 34; *see also* Ex. 25-31. The contract was negotiated and executed on the Reservation. Docket 149-1 ¶ 60. Henry Carlson Company's main office is in Sioux Falls, South Dakota. Docket 149-1 ¶ 35. No meetings were held between the Tribe and Henry Carlson

7

Company in Sioux Falls. *Id.* ¶ 60. Henry Carlson Company and most of its representatives are not enrolled members of the Flandreau Santee Sioux Tribe. Docket 147 ¶ 2. Neither Henry Carlson Company nor its representatives have a permanent office on the Reservation, most of the company's representatives do not reside on the Reservation, and the company traveled from outside of the Reservation to access the Casino property for the project. *Id.* ¶¶ 3-5. Henry Carlson Company performs construction services for entities in addition to the Tribe. *Id.* ¶ 26; Derry Testimony.

In 2015, the Tribe also entered into a contract with Leo A. Daly for architectural services on the renovation construction project. Docket 149-1 ¶ 36. Leo A. Daly is an international firm with an office in Minneapolis, Minnesota. *Id.* ¶ 37. The firm employs more than 200 architects, works in over 40 jurisdictions nationally each year, and has 12 offices worldwide. *Id.* The firm has no permanent office in South Dakota. *Id.* At the time Leo A. Daly was working on the renovation project, it had at least one other project in South Dakota. *Id.* The firm has not worked with the Tribe on any projects other than the Casino renovation project, and a significant portion of the firm's contracts do not involve Indian tribes. Docket 147 ¶¶ 24-25. The firm's policy requires that the architect of record and the engineers of record "be licensed in the state in which they're performing the work." *Id.* ¶ 7.

The contract between Leo A. Daly and the Tribe was executed on the Reservation. Docket 149-1 ¶ 36. Under this contract, the authority having jurisdiction over the renovation project is the Flandreau Santee Sioux Tribe. *Id.*

8

¶ 41. Both the contract between Leo A. Daly and the Tribe and Henry Carlson Company and the Tribe include dispute resolution provisions that do not afford jurisdiction in South Dakota state courts. *Id.* ¶ 61. Instead, both contracts provide for disputes to be resolved by arbitration with enforcement of arbitration awards in federal or tribal court. *Id.*

### C. During-Renovation Services

Henry Carlson Company maintained a project office on-site during the Casino renovation project. *Id.* ¶ 56; Johnson and Derry Testimony. During this time, Brock Nelson, security at Royal River Casino monitored the safety of construction workers on the project. Brock Nelson Testimony; Docket 149-1 ¶ 52. Casino security personnel also provided security and surveillance services of the renovation work area, contractors' offices, and contractors' equipment 24 hours a day. *Id.* ¶ 53. Tribal law enforcement provided governmental services to the contractors during their time on the Reservation. *Id.* ¶ 55. This was paid for by the Tribe. Reider Testimony. The Tribe also made emergency services available to the contractors. *Id.* ¶ 54; *see also* Ex. 40. For example, the Tribe made payments to Moody County Ambulance Service to ensure ambulance services are available. Docket 149-1 ¶ 54.

### D. Tribal, Federal, and State Project Licensing

The Tribe has a Tribal Gaming Commission that is the tribal government agency charged with regulation, enforcement, and oversight of all gaming activities at the Casino. *Id.* ¶ 5. The Tribal Gaming Commission is funded entirely with tribal funds. *Id.* ¶ 6. The Commission promulgates a Rules and

Regulation Manual that the Casino must comply with and is authorized to inspect any area of the Casino at any time. *Id.* ¶¶ 7, 12; *see also* Ex 5. The Commission issues a separate operator's license for each place, facility, or location on tribal lands where the Tribe allows Class III Gaming. Docket 149-1 ¶ 8. The Casino has maintained a Class II and Class III Facility License issued by the Tribal Gaming Commission. *Id.* ¶ 13; *see also* Ex. 6-7.

When the Tribal Gaming Commission issues or renews a facility license, a member of the Tribal Gaming Commission executes a document attesting to the fact that: (a) the Tribe, through the Tribal Gaming Commission, has determined that the construction and maintenance of the facility, and operation of gaming at the facility, is conducted in a manner that adequately protects the environment and the public health and safety, and (b) the Tribe has identified and enforces laws, resolutions, codes, policies, standards and procedures applicable to the facility that protect the environment and the public health and safety, including any standards required under the Tribal-State Gaming Compact. Docket 149-1 ¶ 14. The Tribal Gaming Commission submits a copy of the Tribal Gaming Commission facility license and the attestation to the National Indian Gaming Commission (NIGC) within 30 days of the date it is issued. *Id.* ¶ 15; *see also* Ex. 8-9. The Tribal Gaming Commission did not submit the renovation's construction plans to NIGC for NIGC's approval, but did submit a copy of the facility license and attestation. Docket 147 ¶ 15; *see also* Docket 149-1 ¶¶ 15; Ex. 6-7, 150. The Tribal Gaming Commission can suspend or revoke the Casino's facility license or a

10

Casino employee's gaming license if the facility or the employee poses a danger to the health and safety of the public. Docket 149-1 ¶¶ 16-17. NIGC also has the authority to impose fines, revoke the facility license, or order the Casino closed. McDermott Testimony.

In addition to the Tribal Gaming Commission, the Casino Compliance Officer, Stephen Nelson, regularly conducts health and safety inspections in the Casino. Stephen Nelson Testimony; Docket 149-1 ¶ 18. Indian Health Services (IHS) also conducts inspections of the Casino. Docket 149-1 ¶ 19; *see also* Ex. 10-16. At the request of the Casino Compliance Officer, IHS conducts an inspection of each portion of the Casino construction project as that portion of the project is completed. Docket 149-1 ¶ 20. The Bureau of Indian Affairs (BIA) and NIGC do not require IHS to inspect the Casino, but the Tribe enforces federal standards through these inspections. *Id.* ¶ 21; Docket 147 ¶ 14. IHS inspections are conducted in accordance with federal health and safety standards. Docket 149-1 ¶ 21. Standards established by the State of South Dakota or South Dakota codified law are not part of the IHS inspection protocol. *Id.* If the inspection is not conducted by IHS, the Casino pays private companies to inspect its fire sprinkler systems, elevators, and fire alarm systems. *Id.* ¶ 22; *see also* Docket 152-1 at 25, 53-54; Ex. 12-16.

Based on an agreement between the Architect and the Tribe, the renovation project was designed to meet the standards of: (a) the 2015 International Building Code; (b) the 2015 International Electrical Code; (c) the 2015 International Plumbing Code; and (d) the 2015 International Mechanical

11

Code. Docket 149-1 ¶ 44. The project was designed and built to comply with the federal American with Disabilities Act (ADA). *Id.* ¶ 43. The United States Environmental Protection Agency (EPA) issued coverage under the National Pollutant Discharge Elimination System (NPDES) general permit for the renovation project. *Id.* ¶ 45. The Tribe also required project contractors to notify the Tribe if any employee working on the project was a sex offender and comply with Tribal laws governing sex offender registry. *Id.* ¶ 46.

The Tribe issues business licenses to eligible persons doing business within the Tribe's jurisdiction. *Id.* ¶ 50. In 2018, the Tribe passed a resolution to update its business licensing procedures. *Id.* ¶ 49; *see also* Ex. 36. The Tribe issued and required Leo A. Daly and Henry Carlson Company and all subcontractors of Henry Carlson Company to maintain a Tribal Business License. Docket 149-1 ¶ 51; *see also* Ex. 37. On October 16, 2019, the Tribe issued a Certificate of Occupancy to the Casino. Docket 149-1 ¶ 40; *see also* Ex. 34. The State does not issue business licenses to tribal entities on the Reservation. Adams Testimony.

The South Dakota State Engineer did not issue a building permit for the construction project. Docket 149-1 ¶ 42. But four building specifications for the renovation project required certain professionals to be "licensed in South Dakota" or "legally qualified to practice in the jurisdiction where the project is located." Docket 147 ¶ 8; *see also* Docket 154-16 at 21, 23-28. And one building specification for the renovation project identified that certain items should be preassembled "in the shop to the greatest extent possible." Docket

12

147 ¶ 6. But there is no evidence that any off-site preassembling occurred. Derry Testimony.

### E. South Dakota Contractor's Gross Excise Tax

Under SDCL § 10-46A-1, a contractor's gross receipts are subject to a 2% excise tax. SDCL § 10-46A-1. The legal incidence of the contractor's excise tax is on the contractor. Docket 147 ¶ 9. The contractor may choose to pass the tax on to its customers but is not required to do so by law. *See* SDCL § 10-46A-12. Generally, a contractor's excise tax is deposited into the State of South Dakota general fund. Docket 149-1 ¶ 48. For purposes of the imposition and assessment of a contractor's excise tax, the State of South Dakota deems the location of the contractor's services to be the location of the project. *Id.* ¶ 47. In 2018, South Dakota's contractor's excise tax collections rose by 7%. Docket 149-1 ¶ 73.

There are few state statutory exemptions from the contractor's excise tax. Docket 147 ¶ 10; *see also* SDCL § 10-46A-18.1. Certain construction projects within Indian country, however, are exempt from the contractor's excise tax under federal law. Docket 147 ¶ 11. The South Dakota Department of Revenue requires contractors to complete a "Request for consideration of Indian Use Only Projects" form to receive an exemption from the tax. Adams Testimony; Ex. 195 at 3-4. In the past, the Department of Revenue has exempted the construction of schools, tribal administration buildings, health clinics, and housing projects within Indian country. Adams Testimony. The decision on whether a project is exempted from an excise tax is based on a project-by-

project determination by the Department of Revenue using criteria developed by the Department. Adams Testimony.

Henry Carlson Company submitted a "Request for consideration of Indian Use Only Projects" for the Casino renovation project, which was denied by the Department. Ex. 196. The Tribe then submitted a second request for exemption, which was also denied by the Department. Ex. 189. The Department of Revenue said the requests were denied because the Department does not grant exemptions for work on commercial projects within Indian country. Adams Testimony; *see also* Ex. 189-91, 193-97.

As a result, Henry Carlson Company has remitted and paid some of the contractor's excise tax under protest consistent with SDCL § 10-27-2 to the South Dakota Department of Revenue. Docket 147 ¶¶ 12-13; *see also* Ex. 83. Henry Carlson's protest letter requested that the state issue refunds to the Tribe as the entity who paid the cost of taxes. Docket 147 ¶ 13; Ex. 83. Because the requests for refund of a contractor's excise tax are governed under SDCL ch. 10-59 and not SDCL ch. 10-27, the Department treated the payment as a refund request under SDCL ch. 10-59. Ex. 10003. The Tribe now seeks a judicial declaration that the State does not "have the authority to impose the State's contractor's excise tax" on the project and seeks a refund of the "contractor's excise tax paid or to be paid under protest." Docket 1 at 1. Currently, the Tribe estimates that the contractor's excise tax on the project will be approximately $384,436. Adams Testimony; Ex. 179. Spread pro rata,

14

the contractor's excise tax that would be due on this project each year is about $128,145. *E.g.*, Doug Clark and Stoesser Testimony

The State of South Dakota provides governmental services to individuals and groups within the State. Docket 147 ¶ 27. In 2018, South Dakota's approved budget was $4,807,134,211.00. Docket 149-1 ¶ 74. In 2019, South Dakota's approved budget was $4,844,973,501. Ex. 180. South Dakota's annual general fund budget in 2019 was $1,668,980,834. Ex. 181. Seven percent of the general fund, or $114 million dollars, was funded by the State contractor's excise tax. *Id.* Sixty-two percent of the 2019 State general fund was from sales and use taxes.

The only state governmental services that are relevant to this action are state services that are funded with state general funds and services of the Department of Revenue Business Tax Division that are funded directly by taxes collected. Docket 149-1 ¶ 57. A number of State agencies are not funded by the State general fund and thus are not funded with contractor's excise taxes collected by the State of South Dakota. *Id.* ¶ 58. Departments not funded by the State general fund include the Department of Labor and Regulation's Division of Insurance, the Department of Labor and Regulation's Division of Banking, the Department of Labor and Regulation's Electrical Commission, the Department of Labor and Regulation's Plumbing Commission, the Department of Labor and Regulation's Board of Technical Professions, and the Unified Judicial System's Board of Bar Examiners. *Id.* Currently, no State court cases

15

in the South Dakota Unified Judicial System are related to the Casino renovation project. *Id.* ¶ 59.

### F. Tribal Revenue and Expenditures

The Tribe has paid and is paying for the renovation project with tribal funds primarily derived from gaming revenues. Docket 149-1 ¶ 78. The entire cost of the renovation project was originally financed at a rate of 6%. *Id.* ¶ 80. In 2018, the Tribe refinanced the renovation project using Tribal Gaming Revenue Bonds Series Taxable Series 2018A, Tribal Economic Development Bonds Tax-Exempt Series 2018B, and Tribal Revenue Bonds Tax Exempt Series 2018C. *Id.* ¶ 81. The Tribal Gaming Revenue Bond Series Taxable Series 2018A was issued for $17,275,000.00 at an interest rate of 7.375% with a maturity date of January 1, 2033. *Id.* ¶ 83. The Tribal Economic Development Bonds Tax-Exempt Series 2018B was issued for $6,075,000.00, at an interest rate of 6 %, and with a maturity date of January 1, 2038. *Id.* The Tribal Revenue Bonds Tax Exempt Series 2018C was issued for $5,415,000.00, at an interest rate of 6% and with a maturity date of January 1, 2038. *Id.* The security for financing the renovation project is revenue from the Casino. *Id.* ¶ 79.

The Tribal Gaming Commission required a review of the above financing agreements by the National Indian Gaming Commission General Counsel to ensure the financing agreements did not constitute a management contract. *Id.* ¶ 76. This review was completed in July 2018. *Id.* The BIA was not involved in

the drafting or approval of the renovation project's loan documents. Docket 147 ¶ 18.

The Flandreau Santee Sioux Tribe has adopted a Law and Order Code and other Ordinances that regulate the conduct of individuals and entities on the Reservation. Docket 149-1 ¶ 28; *see also* Ex. 19. Within the Law and Order Code, the Tribe has adopted an Amended Gaming Revenue Allocation Plan under which the Tribe allocates gaming revenue from the Casino. Docket 149-1 ¶ 29; *see also* Ex. 20-21. The Amended Gaming Revenue Allocation Plan was approved by the United States Department of Interior on March 26, 2018. Docket 149-1 ¶ 30; *see also* Ex. 22. The Plan allocates gaming revenue as follows: (a) individual tribal member per capita payments: 40% of the revenue from the Casino; (b) tribal economic development: 35% of the revenue from the Casino; (c) tribal government operations: 15% of the revenue from the Casino; (d) minor's trust fund: 5% of the revenue from the Casino; (e) community assistance fund: 4% of the revenue from the Casino; and (f) higher education fund: 1% of the revenue from the Casino. Docket 149-1 ¶ 29; *see also* Ex. 20-21.

Casino revenue is the largest non-federal source of funds to the tribal government, comprising approximately 40% of the Tribe's income in 2018. Docket 149-1 ¶ 62; Kills-A-Hundred Testimony. Federal funding accounts for approximately 75% of the Tribe's income. Kills-A-Hundred Testimony. Today, gaming revenue accounts for about 25% of the Tribe's budget. Kills-A-Hundred Testimony. The distribution is lower due to gaming revenue being used first

17

and foremost to pay for the bonds that financed the renovation project. Kills-A-Hundred Testimony; Ex. 157. Casino revenue remains the largest non-federal portion of the Tribe's budget. Kills-A-Hundred Testimony. Casino revenue has increased since the beginning of the construction project, with guest feedback indicating that it is the result of the completed renovations. Docket 149-1 ¶ 75. Every dollar spent for the renovation project, including the revenue used to pay the contractor's excise tax, is a dollar the casino does not distribute to the Tribe. *Id.* ¶ 77.

The Tribe utilizes proceeds from the Casino to help fund a variety of on-reservation and tribal projects, as well as off-reservation projects in the local community. For example, the Casino budgets and funds around $1,500 per month of donations to community programs and organizations. *Id.* ¶ 64. The Tribe pays the Moody County Sheriff's Department approximately $15,000.00 per year for law enforcement dispatch services. *Id.* ¶ 70; *see also* Ex. 40, 49. The Tribe funded approximately 50% of the Moody County dispatch system upgrade. Docket 149-1 ¶ 71. The Tribe's on-reservation gun range is used by both the City of Flandreau and Moody County law enforcement departments for training purposes. *Id.* ¶ 72. The Tribe also funds several local but off-reservation services, including purchasing 5 fire trucks for the City of Flandreau's Fire Department, providing funding for teacher salaries and supplies to off-reservation public schools, and funding the construction and maintenance of off-reservation roads. Reider and Kills-A-Hundred Testimony; *See, e.g.*, Ex. 139, 140.

The Tribe pays professional licensure fees for paralegals, attorneys, and notaries it uses. Docket 149-1 ¶¶ 67-68. The Tribe pays license plate fees, title transfer fees, and lien notation fees for all tribal vehicles, including Casino vehicles. *Id.* ¶ 69. The Tribe and the Casino pay fuel taxes for fuel purchased for its vehicles both on and off reservation, and those taxes are all remitted to the state of South Dakota by the fuel supplier. *Id.* ¶ 63. The Casino pays state unemployment taxes for all casino employees, and the Tribe pays state unemployment taxes for all tribal employees. Docket 149-1 ¶ 65; *see also* Ex. 39. The Casino pays the State's invoices for slot machine inspections conducted by the South Dakota Gaming Commission. Docket 149-1 ¶ 66.

Similarly, virtually all government services on-reservation are provided or funded by the Tribe. Some governmental services that the Tribe offers, however, are not available to non-Indians. Docket 147 ¶ 28. The tribal police department provides law enforcement services on-reservation. Ex. 44-45, 53. The Tribe maintains and funds 3 Mile Road, and other roads, highways, streetlights, and walkways. *See* Ex. 56, 102, 104-07. The Tribe operates a judicial system, including criminal, civil, and juvenile court. Reider Testimony; *see also* Ex. 132, 135-37. The Tribe funds ambulance and paramedic services, dispatch services, and fire protection on the reservation. Kills-A-Hundred Testimony; *see also* Ex. 40, 49, 52, 54. The Tribe operates a health clinic that the Tribe recently expanded. Reider Testimony. The Tribe also provides an array of additional social services including meals for the elderly, tribal transportation, domestic violence victim assistance, housing, community

19

center, and most recently COVID emergency assistance. *See* Ex. 50, 120-122, 142-47.

### G. Indian Trader Statutes

The BIA acknowledges that Congress granted the Department of Interior broad authority to regulate trade with tribes when it enacted the Indian Trader Statutes. Docket 149-1 ¶ 84. At the commencement of the renovation project, neither Henry Carlson Company nor its representatives had been issued a license as Indian traders under the Indian Trader Statutes. Docket 147 ¶ 20. The Tribe did not procure a federal Indian traders' license application from the BIA. *Id.* ¶ 21. The Tribe also did not submit an application to the BIA to obtain a federal Indian trader license for Henry Carlson Company because, based on its communication with the BIA, the Tribe understood that it "couldn't do such a thing in [the Tribe's] area." *Id.* ¶ 22 (alternation in original). The BIA was not made aware of the Tribe's contract with Henry Carlson Company during the negotiations of the contract. *Id.* ¶ 19. As such the BIA was not involved in drafting or approving the Tribe's contract with Henry Carlson Company or Leo A. Daly. *Id.* ¶¶ 16-17. No federal agency has been involved in the contract negotiation process between the Tribe and Henry Carlson Company to ensure that Henry Carlson Company is charging a fair price for the construction services. *Id.* ¶ 23.

## II.    LEGAL CONCLUSIONS

### A. Per se Invalidity

"The initial and frequently dispositive question in Indian tax cases . . . is who bears the legal incidence of a tax." *Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995). That is because, absent a federal statute permitting, "a State is without power to tax reservation lands and reservation Indians." *Id.* (quoting *Cty. of Yakima v. Confederated Tribes & Bands of Yakima Nation*, 502 U.S. 251, 258 (1992)). Thus, "[i]f the legal incidence of an excise tax rests on a tribe or on tribal members for sales made inside Indian country, the tax cannot be enforced absent clear congressional authorization." *Id.* at 459. "But if the legal incidence of the tax rests on non-Indians, no categorical bar prevents enforcement of the tax[.]" *Id.* Here, it is undisputed that the legal incidence of the tax rests on the non-Indian contractor, Henry Carlson Company, because under South Dakota law, the contractor has the legal obligation to pay the contractor's excise tax. *See* SDCL § 10-46A-1; *see also* Docket 147 ¶ 9; *cf.* *Valley Power Sys. v. S.D. Dep't of Revenue*, 905 N.W.2d 328, 331 (S.D. 2017). As a result, the court finds the State is not categorically barred from imposing its tax and the tax is not per se invalid.

### B. Express or Implied Preemption Under IGRA

"More difficult questions arise where, as here, a state asserts authority over the conduct of non-Indians engaging in activity on the reservation." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980). "[T]here is no rigid rule by which to resolve the question whether a particular state law may be

applied to an Indian reservation or to tribal members." *Id.* at 142. The Supreme Court has identified two independent but related "barriers" to a state's exercise of regulatory authority to tax non-Indian on-reservation activity. *Ramah Navajo Sch. Bd. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 837 (1982). "First, the exercise of such authority may be pre-empted by federal law." *Bracker*, 448 U.S. at 142. "Second, [the exercise of state authority] may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' " *Id.* (quoting *Williams v. Lee*, 358 U.S. 217, 220 (1959)). These barriers are "independent but related." *Id.*

> The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop" . . . against which vague or ambiguous federal enactments must always be measured.

*Id.* at 143 (quoting *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 172 (1973)). This court first considers whether IGRA expressly preempts the State's exercise of authority.

On appeal, the Eighth Circuit found that IGRA does not expressly or by implication preempt the State contractor's excise tax. *Haeder*, 938 F.3d at 944; *see also* Docket 121. The Eighth Circuit similarly found in *Flandreau Santee Sioux Tribe v. Noem*, a companion case, that IGRA does not expressly or by implication preempt a State use tax on nonmember activities at the Royal River Casino on-reservation. 938 F.3d 928, 935-37 (2019), *cert. denied* 140 S. Ct.

2804 (2020). The Eighth Circuit reasoned that IGRA protects Class III gaming activity, which the Supreme Court has described as "what goes on in a casino[.]" *Id.* at 934 (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014)). The Eighth Circuit agreed with the Tenth Circuit's interpretation of *Bay Mills*, concluding that "Class III gaming activity relates only to activities actually involved in the *playing* of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike." *Id.* at 935 (quoting *Navajo Nation v. Dalley*, 896 F.3d 1196, 1207 (10th Cir. 2018)). The Eighth Circuit also held that IGRA's "catchall provision" does not preempt imposing the contractor's excise tax at issue. *Haeder*, 938 F.3d at 944. Agreeing with the Ninth Circuit, the Court noted that if "IGRA itself preempts the state taxation of non-Indian contractors working on tribal territory, we would effectively ignore *Bracker* and its progeny." *Id.* at 945 (quoting *Baron Band of Mission Indians v. Yee*, 528 F.3d 1184, 1193 (9th Cir. 2008)).

Thus, the Eighth Circuit found in both *Noem* and *Haeder* that IGRA "does not preempt state taxation of nonmember activity, other than 'what goes on in a casino.'" *Noem*, 938 F.3d at 934; *see also Haeder*, 938 F.3d at 944. The Eighth Circuit "conclude[d] that the question of federal preemption in this case must be determined by conducting the analysis mandated by *Bracker* to determine whether the State's interests in imposing the tax outweigh the relevant federal and Tribal interests." *Noem*, 938 F.3d at 935; *see also Haeder*, 938 F.3d at 945. Based on the Eighth Circuit's opinion in this case on appeal

23

and in *Noem*, the court finds the contractor's excise tax is not expressly preempted by federal law.

### C. Preemption Under *Bracker* Balancing Test- IGRA

"Federal preemption is not limited to cases in which Congress has expressly preempted the state tax." *Noem*, 938 F.3d at 932 (citation omitted). "Although determining whether federal legislation has pre-empted state taxation . . . is primarily an exercise in examining congressional intent, the history of tribal sovereignty serves as a necessary backdrop to that process." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176 (1989) (internal quotation omitted). Thus, if not expressly preempted under federal law, a state tax may unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them." *Bracker*, 448 U.S. at 142 (quoting *Williams*, 358 U.S. at 220). This is because generally a state does not have regulatory power over the on-reservation conduct of Indians. *See id.* at 144. Where a state asserts authority over on-reservation conduct of non-Indians, a court must engage in a "particularized inquiry into the nature of the state, federal, and tribal interests at stake, [and] . . . determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* at 144-45.

This *Bracker* analysis is "not controlled by 'mechanical or absolute conceptions of state or tribal sovereignty.' " *Cotton Petroleum*, 490 U.S. at 176 (quoting *Bracker*, 448 U.S. at 145). Instead, courts are to "appl[y] a flexible preemption analysis sensitive to the particular facts and legislation involved." *Id.* This fact-intensive examination must be "cognizant of both the broad

24

policies that underlie the legislation and the history of tribal independence in the field at issue." *Id.*; *see also Ramah*, 458 U.S. at 838 (noting "the traditional notion of tribal sovereignty, and the recognition and encouragement of this sovereignty in congressional Acts promoting tribal independence and economic development, inform the pre-emption analysis that governs this inquiry."). Courts have typically focused the inquiry on 3 primary factors: "(1) the extent of the federal and tribal regulations governing the taxed activity; (2) whether the economic burden of the tax falls on the tribe or the non-Indian individual or entity; and (3) the extent of the state interest justifying the imposition of the taxes." *Ute Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1187 (10th Cir. 2011) (internal quotation omitted); *see also Noem*, 938 F.3d at 935 (quoting Felix S. Cohen, *Handbook of Federal Indian Law* § 8.03[1][d] (2012)) ("Salient factors include the extent of federal regulation and control, the regulatory and revenue-raising interests of states and tribes, and the provision of state or tribal services."). The Supreme Court has repeatedly applied and reaffirmed the *Bracker* interest-balancing test. *See Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 110-11 (2005) (collecting cases that apply the *Bracker* test).

Thus, the "particularized inquiry" this court is instructed to employ is best understood as it has been applied by the Supreme Court in previous cases such as *Bracker*, *Ramah*, *Cotton Petroleum*, and *Colville*. First, in *Bracker*, the Supreme Court addressed Arizona's motor carrier license and use fuel taxes as applied to a non-Indian logging company's use of roads that were located on tribal land. 448 U.S. at 139-40. The Supreme Court found that Arizona's

general desire to raise revenue without "a responsibility or service that justifie[d] the assertion of taxes imposed for on-reservation operations conducted solely on tribal and Bureau of Indian Affairs roads" was not sufficient to overcome the tribal and federal interests. *Id.* at 150. The Supreme Court found it to be "undisputed that the economic burden of the asserted taxes . . . ultimately [fell] on the Tribe." *Id.* at 151. The Court noted:

> Where, as here, the Federal Government has undertaken comprehensive regulation . . . where a number of the policies underlying the federal regulatory scheme are threatened by the taxes . . . and where [the state is] unable to justify the taxes except in terms of a generalized interest in raising revenue, we believe that the proposed exercise of state authority is impermissible.

*Id.* Thus, the Supreme Court concluded that the state tax was preempted. *Id.*

In *Ramah*, the Supreme Court addressed a New Mexico gross receipts tax that has been imposed on a non-Indian construction company for the construction of a tribal school on the reservation. 458 U.S. at 835-36. Although the construction company initially paid the state tax, the company "was reimbursed by the [tribe] for the full amount paid" and thus, as in *Bracker*, the economic incidence of the tax ultimately fell on the tribe. *Id.* at 835. The Supreme Court noted that New Mexico did not provide any services to the tribe that were funded by the tax and reasoned that "[f]ederal regulation of the construction and financing of Indian educational institutions [was] both comprehensive and pervasive"—a scheme that "left the State with no duties or responsibilities." *Id.* at 839, 843 (quoting *Warren Trading Post Co. v. Ariz. State Tax Comm'n*, 380 U.S. 685, 691 (1965)). The Court further stated that the State

was unable to identify "any specific, legitimate regulatory interest to justify the imposition of it gross receipts tax" and "the State [did] not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax." *Id.* at 843.

New Mexico argued that services provided to the construction company for its activities off-reservation were significant enough to justify the tax, but the Supreme Court rejected this argument, noting:

> The only arguably specific interest advanced by the state is that it provides services to [the non-Indian construction company] for its activities off the reservation. This interest, however, is not a legitimate justification for a tax whose ultimate burden falls on the tribal organization. Furthermore, although the State may confer substantial benefits on [the non-Indian construction company] as a state contractor, we fail to see how these benefits can justify a tax imposed on the construction of school facilities on tribal lands pursuant to a contract between the tribal organization and the non-Indian contracting firm.

*Id.* at 843-44. The Court found "[t]he State's ultimate justification . . . amount[ed] to nothing more than a general desire to increase revenues," which was "insufficient to justify the additional burdens imposed by the tax . . . on the express federal policy of encouraging Indian self-sufficiency in the area of education." *Id.* at 845. Thus, after considering the *Bracker* factors, the Court found New Mexico's gross receipts tax preempted by federal law. *Id.* at 846-47.

In *Cotton Petroleum*, the Supreme Court addressed New Mexico's tax on a non-Indian company's on-reservation oil and gas operations, finding the tax was permissible under the *Bracker* analysis. 490 U.S. at 186-87. Applying the principles articulated in *Bracker* and *Ramah*, the Court first found that the

27

Indian Mineral Leasing Act (IMLA) "neither expressly permit[ted] state taxation nor expressly preclude[d] it[.]" *Id.* at 177. The Court found that, historically, states were expressly permitted to tax oil and gas production on reservations, noting that there "simply [is] no history of tribal independence from state taxation of these lessees to form a 'backdrop' against which the [IMLA] must be read." *Id.* at 182. The Court "agree[d] that the purpose of [IMLA] is to provide Indian tribes with badly needed revenue, but f[ound] no evidence for the further supposition that Congress intended to remove all barriers to profit maximization" through IMLA. *Id.* at 180. Thus, the Court found there was not a strong federal interest in preventing New Mexico's taxation of on-reservation oil and gas production. *Id.* at 186-87.

The Supreme Court next analyzed the state, federal, and tribal interests, distinguishing New Mexico's tax on oil and gas production from the taxes in *Bracker* and *Ramah*. *Id.* at 184-85. The Court found the federal regulatory scheme to be "extensive" but "not exclusive" as were the federal regulations in *Bracker* and *Ramah*, because the "State regulate[d] the spacing and mechanical integrity of the wells located on the reservation." *Id.* at 186. The Court reasoned that New Mexico had a valid interest in imposition of the tax because the State "provide[d] substantial services" to the tribe and to the oil company at nearly $3 million dollars per year. *Id.* at 185. This was unlike the state interests in *Bracker* and *Ramah* where "both cases involved complete abdication or noninvolvement of the State in the on-reservation activity." *Id.* Finally, the Court found that the incidence of the tax did not fall on the tribe because the

28

taxes were paid by the oil company and were never passed onto the tribe. *See id.* at 168, 185. Thus, considering the minimal interest expressed by Congress in on-reservation oil and gas regulation, New Mexico's strong interest in the on-reservation oil and gas production based on the services the State provided to the oil company and the tribe on-reservation, and the economic burden of the tax falling on the non-Indian company, the Court held the tax was not preempted by federal law. *Id.* at 186-87.

In *Washington v. Confederated Tribes of Colville Indian Reservation*, the Supreme Court considered the State of Washington's tax on cigarettes sold to non-Indians on the reservation, finding that the tax was not preempted because the tribal cigarette sellers were only in business to offer an exemption to off-reservation customers. 447 U.S. 134, 155 (1980). The Court stated that tribal interests are "strongest when the revenues are derived from value generated on the reservation by activities involving the tribes and when the taxpayer is the recipient of tribal services." *Id.* at 156-57. And the Court stated that it did "not believe that principles of federal Indian law . . . authorize Indian tribes [] to market an exemption from state taxation to persons who would normally do their business elsewhere." *Id.* at 155. Thus, unlike *Bracker* and *Ramah*, Washington's interest in taxing non-Indians who would otherwise purchase cigarettes off-reservation was stronger than the tribe's general interest in creating a tax exemption.

Finally, in *California v. Cabazon Band of Mission Indians*, the Supreme Court applied *Bracker* to Indian gaming, emphasizing that a tribe not only

provides gaming but also ancillary services that then increase on-reservation gaming. 480 U.S. 202, 219-20 (1987). In *Cabazon*, the State of California sought to prohibit bingo games played on the reservation at a tribal casino. *Id.* at 205. The Supreme Court held that the State "lacked any regulatory authority over gaming in Indian lands." *Bay Mills*, 572 U.S. at 794 (describing the holding in *Cabazon*). The Court specifically noted that tribes "have built modern facilities which provide recreational opportunities and ancillary services to their patrons, who . . . spend extended periods of time there enjoying the services the Tribe provides." *Cabazon*, 480 U.S. at 219. Based on this, "Tribes have a strong incentive to provide comfortable, clean, and attractive facilities . . . in order to increase attendance at the games." *Id.* Thus, weighing the *Bracker* factors, the Court concluded that the federal and tribal interests in Indian gaming outweighed the State's interest in organized crime prevention. *Id.* at 221-22.

Like the Supreme Court, Courts of Appeals have also applied *Bracker* to state taxation on-reservation. For example, in *Barona Band of Mission Indians v. Yee*, the Ninth Circuit found that California could impose a sales tax on purchases made for casino renovations. 528 F.3d at 1192. The Ninth Circuit listed factors that aid in the balancing of respective interests under *Bracker* including "the degree of federal regulation involved, the respective governmental interests of the tribes and states (both regulatory and revenue raising), and the provision of tribal or state services to the party the state seeks to tax." 528 F.3d at 1190 (citation omitted).

30

In *Yee*, the tribe engaged in a renovation of its on-reservation casino. *Id.* at 1187. Similar to the issue in *Colville*, the tribe and the contractor devised contractual language that circumvented state sales tax by scheduling deliveries to occur only on tribal lands. *Id.* To that end, the tribe and the non-Indian contractor "contracted to create a taxable event on Indian territory which otherwise would occur on non-Indian territory[.]" *Id.* at 1191. Based on these facts, the Ninth Circuit rejected the argument that the sales tax was preempted by IGRA because "IGRA's comprehensive regulation of Indian gaming does not occupy the field with respect to sales taxes imposed on third-party purchases of equipment used to construct the gaming facilities." *Id.* at 1193.

The Ninth Circuit relied on authority "express[ing] disfavor toward tribal manipulation of tax policy" and reasoned that the case was distinguishable from "the multitude of cases where courts have analyzed state taxation on non-Indians performing work on Indian land. *Id.* at 1190-91. Because the purchases were consummated on tribal land "for the sole purpose of receiving preferential tax treatment," the Court found that the state's interests outweighed the tribe's interests. *Id.* at 1191. The Court also noted that federal interests were minimal in commercial activity "rigged to trigger a tax exemption." *Id.* at 1192. Thus, after considering the *Bracker* factors, the Ninth Circuit found the sales tax was not preempted. *Id.* at 1193.

In *Mashantucket Pequot Tribe v. Town of Ledyard*, the Second Circuit applied the *Bracker* analysis to Connecticut's tax on slot machines sold to a tribal casino by non-Indian vendors. 722 F.3d 457, 472 (2d Cir. 2013). In

31

analyzing the federal interests, the Second Circuit found that IGRA did not expressly preempt the tax. *Id.* at 467. The Second Circuit found that because "the incidence of the generally applicable tax falls on the non-Indian's *ownership of property*, rather than on the *transaction* between the Tribe and the non-Indian," tribal interests were minimal. *Id.* at 469. The Second Circuit noted that because the tax was $20,000 per year, and "less than two tenths of one percent of the . . . revenue per annum that the vendors anticipate from their dealings with the Tribe," the tribal interests were weak and "[t]he tax's economic effect on the Tribe is less than minimal." *Id.* at 474. The Court reasoned that there was a "nexus between the tax and the services that the Town provides" including "the education and [school busing] of the Tribe's children." *Id.* at 475 (citation omitted). Thus, under the *Bracker* factors, the Second Circuit found the state tax was not preempted. *Id.* at 477.

The Eighth Circuit has also applied the *Bracker* test in numerous cases, including in *Marty Indian School Bd., Inc. v. South Dakota*, 824 F.2d 684, 687 (8th Cir. 1987). In *Marty Indian School Board*, the State of South Dakota sought to impose a motor fuel tax on fuel that was purchased by the school from a non-Indian oil company. *Id.* at 685. The Eighth Circuit, applying *Bracker*, found a strongly expressed federal interest and policy in favor of developing Indian-controlled educational opportunities that were "tailored to the needs and goals of the Indian people." *Id.* at 687. Applying the reasoning from *Ramah*, the Eighth Circuit stated that the Yankton Sioux Tribe sought to "promote Indian self-determination by creating and operating an Indian school . . .

32

operated exclusively by members of the Tribe[,] . . . which offer[ed] classes specifically designed for Indian students[.]" *Id.* (citation omitted). In contrast, the State of South Dakota's revenues from the fuel tax were used to maintain roads and were not used for the benefit of educating Indian children. *Id.* at 688. Thus, the Eighth Circuit found that, under *Bracker*, "the strong federal policy of promoting Indian self-determination and education and the pervasive involvement of the federal government" left "no room for the additional burden which the state's tax would impose," and thus the tax was preempted. *Id.*

Finally, the Eighth Circuit most recently applied the *Bracker* test in both this case on appeal and in its companion case—*Noem*. In *Noem*, the Eighth Circuit identified the factors to be weighed under *Bracker*, noting that the "[s]alient factors include the extent of federal regulation and control, the regulatory and revenue-raising interests of states and tribes, and the provision of state or tribal services." 938 F.3d at 935 (quoting Cohen, *Handbook of Federal Indian Law* § 8.03[1][d]). Analyzing these *Bracker* factors, the Eighth Circuit held that (1) South Dakota's interest in collecting a state use tax from the Royal River Casino's patrons was merely a "generalized interest in raising revenue," and (2) the State's interest did not outweigh the federal and tribal interest at stake. *Noem*, 938 F.3d at 937 (quoting *Bracker*, 448 U.S. at 150).[2] The Court found that "IGRA endorsed substantial tribal independence and

---

[2] The Supreme Court denied certiorari in *Noem*, upholding the *Bracker* analysis applied by the district court and affirmed in relevant part by the Eighth Circuit Court of Appeals. *Noem v. Flandreau Santee Sioux Tribe*, 140 S. Ct. 2804 (2020).

protected tribes from state interference in the operation of gaming activity, except for limited state regulation through Class III gaming compacts." *Id.* at 936. The Eighth Circuit noted that even where the taxed activity is not "directly related to the operation of gaming activities" within the meaning of 25 U.S.C. § 2710(d)(3)(C)(vii), the activity nevertheless may be preempted under *Bracker* where the taxed activity "contribute[s] significantly to the economic success of the Tribe's Class III gaming at the Casino." *Id.* Thus, because the "State's interest in raising revenues to provide government services throughout South Dakota [did] not outweigh the federal and tribal interests . . . reflected in IGRA and the history of tribal independence in gaming," the Court found the use tax preempted. *Id.* at 937.

Guided by the cases summarized above, the issue in this case turns on whether the imposition of the State contractor's excise tax on Henry Carlson Company, a non-Indian contractor, for construction services performed on-reservation is preempted under the *Bracker* balancing test. *See Haeder*, 938 F.3d at 945-47; *see also Bracker*, 448 U.S. at 150-51. In conducting the analysis, this court focuses on "the extent of federal regulation and control, the regulatory and revenue-raising interests of states and tribes, and the provision of state or tribal services." Cohen, *Handbook of Federal Indian Law* § 8.03[1][d] (citing *Cotton Petroleum*, 490 U.S. at 176-77; *Cent. Mach. Co. v. Ariz. State Tax Comm'n*, 448 U.S. 160, 161-63 (1980); *Bracker*, 448 U.S. at 136). The history of tribal independence with respect to gaming, the federal policies reflected in IGRA, and the federal and tribal interests at stake may preempt the

34

contractor's excise tax unless the State's interest in applying the tax to Henry Carlson Company is enough to overcome these factors. *See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983)). The court first considers the history of tribal sovereignty, federal interests, and extent of federal regulation and control in Indian gaming.

## 1. History of Tribal Sovereignty and Federal Interests

First, the court considers the history of tribal sovereignty. For purposes of the *Bracker* balancing test, "[a]lthough determining whether federal legislation has pre-empted state taxation of lessees of Indian land is primarily an exercise in examining congressional intent, the history of tribal sovereignty serves as a necessary backdrop to that process." *Cotton Petroleum*, 490 U.S. at 176 (internal quotation omitted); *see also Noem*, 938 F.3d at 936. Long before the formation of the United States, Tribes "were self-governing sovereign political communities." *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978) *superseded by statute*, 25 U.S.C. § 1301(2), *as recognized in United States v. Lara,* 541 U.S. 193 (2004). And Tribes "have not given up their full sovereignty." *Id.* at 323. The Supreme Court has consistently recognized that Indian Tribes retain "attributes of sovereignty over both their members and their territory[.]" *United States v. Mazurie*, 419 U.S. 544, 557 (1975). The Court has recognized that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *Colville*, 447 U.S. at 154. Absent Congressional authority, Tribes "retain their existing sovereign powers" and "possess those aspects of sovereignty not withdrawn by treaty or statute, or by

35

implication as a necessary result of their dependent status." *Wheeler*, 435 U.S. at 323. Just a few months ago, the Supreme Court reiterated that "[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history[.]" *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2476 (2020) (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945)).

The Supreme Court explained in *Bracker* that there is "a firm federal policy of promoting tribal self-sufficiency[.]" 448 U.S. at 143. "Ambiguities in federal law have been construed generously in order to comport with these traditional notions of sovereignty and with the federal policy of encouraging tribal independence." *Id.* at 143-44. Thus, this "traditional notion[] of tribal sovereignty, and the recognition and encouragement of this sovereignty in congressional Acts [including IGRA], promoting tribal independence and economic development, inform the pre-emption analysis that governs" this court's inquiry. *Ramah*, 458 U.S. at 838.

The backdrop of relevant tribal sovereignty in the field at issue—tribal gaming—also illustrates a history of tribal independence in the operation of on-reservation gaming. "Indian gaming began to develop as a source for commercial revenue for Tribes in the 1970s, primarily as high stakes bingo operations." Cohen, *Handbook of Federal Indian Law* § 1201. In the 1980s, tribes began to seek authority to legalize gambling as a way for Tribes to earn revenues. *See Texas v. United States*, 497 F.3d 491, 493 (5th Cir. 2007). As discussed above, the Supreme Court held in *Cabazon* that because Congress had not expressly provided otherwise, "tribes were free from non-criminal state

36

regulation of tribal gaming on reservations." *Noem*, 938 F.3d at 936 (citing *Cabazon*, 480 U.S. at 214, 221-22). Thus, in response to *Cabazon*, Congress passed IGRA in 1988 "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," and to establish an "independent Federal regulatory authority for gaming on Indian lands" as well as "Federal standards for gaming on Indian lands." 25 U.S.C. § 2702(1), (3).

IGRA has been described as Congress's "strongest and most explicit statement in favor of tribal economic development" and was created to "ensure that the Indian tribe is the primary beneficiary of the gaming operation." Matthew L.M. Fletcher, *The Supreme Court and Federal Indian Policy*, 85 Neb. L. Rev. 121, 146 (2006); 25 U.S.C. § 2702(1)-(2). "IGRA was Congress'[s] compromise solution to the difficult questions involving Indian gaming." *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002), *aff'd* 353 F.3d 712 (9th Cir. 2003). The Eighth Circuit has held that the "text and structure of IGRA, its legislative history, and its jurisdictional framework . . . indicate[] that Congress intended it completely preempt state law. There is a comprehensive treatment of issues affecting the regulation of Indian gaming." *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996). And as discussed in *Noem*, Congress intended to retain this framework of regulation, for "IGRA endorsed substantial tribal independence and protected tribes from state interference in the operation of gaming activity, except for

limited state regulation through Class III gaming compacts." 938 F.3d at 936.

*See* S. Rep. No. 100-446, at 5 (1988). IGRA provides in relevant part:

> [N]othing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity.

25 U.S.C. § 2710(d)(4).

Thus, the federal interests at issue in this case are articulated within the text of IGRA: "promoting tribal economic development, self-sufficiency, and strong tribal government," "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation," and "protect[ing] such gaming as a means of general tribal revenue." 25 U.S.C. § 2702. As the Supreme Court noted in *Mescalero*, "both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes." 462 U.S. at 334-35 (citation omitted). The Court also noted that "Congress'[s] objective of furthering tribal self-government . . . includes Congress'[s] overriding goal of encouraging tribal self-sufficiency and economic development." *Id.* (internal quotation omitted). This federal interest in promoting economic development, tribal self-sufficiency, and tribal self-determination is also reflected in numerous federal statutes and polices. *See* Ex. 57 at 41-42 (outlining the policies reflected in federal statutes and regulations).

Consistent with the historical backdrop of tribal sovereignty in gaming and the goals articulated in IGRA, courts have expressed a strong federal

interest in regulating gaming activity to encourage economic development on Indian reservations. For example, in *City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, the Eighth Circuit stated that "IGRA explicitly defined the policies and goals which led to its enactment. Congress indicated that its intent upon passing IGRA was 'to provide a statutory basis for the regulation of gaming by an Indian tribe adequate . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation.'" 785 F.3d 1207, 1211 (8th Cir. 2015) (quoting 25 § U.S.C. 2702(2)); *see also* S. Rep. No. 100-446, at 13 (1988) (noting that a "tribe's governmental interests include raising revenues to provide governmental services," and "realizing the objectives of economic self-sufficiency and Indian self-determination."). "Congress has noted that for tribes, gaming income 'often means the difference between an adequate governmental program and a skeletal program that is totally dependent on Federal funding.'" *City of Duluth*, 785 F.3d at 1211 (quoting S. Rep. No. 100-446, at 3 (1988)).

### a. Extent of Federal Regulation and Control: Protecting the Environment, Ensuring Public Health and Safety, and Promoting Tribal Self-Sufficiency and Strong Tribal Government

On appeal, the Eighth Circuit held that the summary judgment record did not establish the State contractor's excise tax "implicate[d] the relevant federal . . . interests." *Haeder*, 938 F.3d at 946. In concluding that IGRA did not expressly preempt the excise tax, the Eighth Circuit noted that the provisions of IGRA mandating NIGC approval of the construction and

maintenance of gaming facilities were not "comprehensive and pervasive" federal regulation or control. *Id.* at 945. But here, although IGRA is not comprehensive and pervasive to expressly preempt the tax, evidence at trial established that federal regulation under IGRA is extensive, illustrating the federal interest in the regulation and construction of Indian gaming facilities, as well as the federal interest in simultaneously promoting tribal self-sufficiency and tribal governance.

IGRA controls the construction and maintenance of tribal casino facilities by assigning tribes the responsibility to regulate the operation of casino gaming with federal oversight. *See* 25 U.S.C. § 2710(d)(1). IGRA established the NIGC and provides it the power to approve tribal ordinances or resolutions regulating class II and III gaming and gaming facilities, establish rates of fees, close gaming facilities, and approve contracts. 25 U.S.C. §§ 2703-06, 2710-11, 2713. IGRA requires that a tribe engaging in Class III gaming adopt, and the Chairman of the NIGC approve, a resolution that provides that "the construction and maintenance of the gaming facility, and the operation of that gaming is conducted in a manner which adequately protects the environment and the public health and safety[.]" 25 U.S.C. § 2710(b)(2)(E). Thus, the court finds 25 U.S.C. § 2710(b)(2)(E) is evidence of a strong federal interest in the adequate and safe construction of tribal gaming facilities, including the construction and renovation here of the Royal River Casino.

The court also finds 25 U.S.C. § 2710 is also evidence of the federal goal of promoting tribal self-sufficiency and tribal government articulated in IGRA.

*See* 25 U.S.C. § 2702. NIGC leaves the management of casino construction to each tribe, allowing tribes to actively regulate construction activity and prescribe whatever public health and safety requirements each tribe deems fit. *See* 25 U.S.C. § 2710(b)(2)(E). IGRA does not mandate that a state certify the health and safety of Indian gaming patrons. Instead, consistent with its goals of promoting tribal sovereignty and tribal government, IGRA places the burden on tribes to certify that its gaming facilities protect the health and safety of its patrons.

Here, evidence at trial established that the Tribal-State Gaming Compact negotiated by the Tribe and the State did not provide for any State inspection or maintenance of the Casino to protect the health and safety of patrons. *See* Docket 149-1 ¶ 26; *see also* Ex. 17-18. The State did not regulate the renovation project under the Tribal-State Gaming Compact. Reider, Gilbert, and Derry Testimony. Instead, consistent with the goals of IGRA, all inspections and regulatory involvement in the Casino renovation were conducted by either federal or tribal agencies. First, as required by IGRA, the Tribe adopted federally approved Class II and Class III Gaming Ordinances. Docket 149-1 ¶¶ 3-4; *see also* Ex. 1-4. The Tribe's Class II Gaming Ordinance provides that "the Tribe shall issue a separate license to each place, facility, or location on Indian lands where Class II gaming is conducted under this Ordinance." Docket 149-1 ¶ 9. It does not provide that the State do so. This federally approved Class II Gaming Ordinance also requires that, "Class II gaming facilities shall be constructed, maintained, and operated in a manner

41

that adequately protects the environment and the health and safety of the public." *Id.* ¶ 11. The Tribe's Class III Gaming Ordinance also requires that "[n]o facility will be granted a license unless such facility is constructed, maintained, and operated in a manner that adequately protects the environment and the public health and safety." *Id.* ¶ 10. 25 C.F.R. § 559.4 also requires that the Tribe "identif[y] and enforce laws, resolutions, codes, policies, standards, or procedures applicable to each gaming place, facility, or location that protect the environment and the public health and safety[.] 25 C.F.R § 559.4.

The Tribe has a Tribal Gaming Commission that is the agency of the Tribal government charged with regulation, enforcement, and oversight of all gaming activities at the Casino. Gilbert Testimony; *see also* Docket 149-1 ¶ 5. The Tribal Gaming Commission is funded entirely with tribal funds. Docket 149-1 ¶ 6. The Commission promulgated a Rules and Regulation Manual that the Casino must comply with and is authorized to inspect any area of the Casino at any time. *Id.* ¶¶ 7, 12; *see also* Ex 5, 42; Gilbert Testimony. The Commission issues a separate operator's license for each place, facility, or location on tribal land where the Tribe allows Class III Gaming. Docket 149-1 ¶ 8. Both IGRA and the Tribe's Class II and Class III Ordinances require the Tribe's gaming regulators and Casino management to certify that the Casino is built and maintained in a manner that protects the safety and health of the public and patrons and the environment. *Id.* ¶¶ 9-10; *see also* 25 U.S.C. § 2710(b)(2)(E); 25 C.F.R. § 559.4; Ex. 8-9, 41, 150. The State does not do so.

Ron Gilbert, Director of the Tribal Gaming Commission, testified at length about the requirements IGRA and the Tribe have in place to ensure that casino construction, maintenance, and operation adequately protect the public's health and safety. Gilbert Testimony. The Casino has maintained a Class II and Class III Facility License issued by the Tribal Gaming Commission. Docket 149-1 ¶ 13; *see also* Ex. 6-7, 150. When the Tribal Gaming Commission issues or renews a facility license, a member of the Tribal Gaming Commission executes a document attesting to the fact that: (a) the Tribe, through the Tribal Gaming Commission, has determined that the construction and maintenance of the facility, and operation of gaming at the facility, is conducted in a manner which adequately protects the environment and public health and safety, and (b) the Tribe has identified and enforces laws, resolutions, codes, policies, standards and procedures applicable to the facility that protect the environment and public health and safety, including any standards required under the Tribal-State Gaming Compact. Docket 149-1 ¶ 14.

Although the Tribal Gaming Commission did not submit the renovation's construction plans to NIGC for NIGC's approval, the Tribal Gaming Commission did submit a copy of the facility license and the attestation of the Tribal Gaming Commission, as required by federal law, to the National Indian Gaming Commission (NIGC) within 30 days of the date it was issued showing that the Tribe determined and certified that the Casino's facility construction, maintenance, and operation adequately protect public health and safety. Docket 149-1 ¶ 15, 25; *see also* Gilbert Testimony; Ex. 6-9; Docket 147 ¶ 15.

43

The Tribal Gaming Commission can suspend or revoke the Casino's facility license or a Casino employee's gaming license if the facility or the employee poses a danger to the health and safety of the public. Docket 149-1 ¶¶ 16-17. If unsafe or hazardous, the Tribal Gaming Commission or the NIGC can order the Casino closed. Gilbert Testimony; *see also* Docket 152-1 at 52; 25 U.S.C. § 2713; 25 C.F.R. §§ 559.3-6. The court finds this regulatory scheme evidence of a strong federal interest in the construction and maintenance of tribal gaming facilities while simultaneously advancing the goals articulated in IGRA of promoting tribal self-sufficiency and strong tribal government.

On appeal, the Eighth Circuit also noted that "the summary judgment record [failed to establish any federal] involvement to date in the Casino renovations at issue." *Haeder*, 948 F.3d at 945. But at trial, evidence established that all inspections and regulatory involvement during the Casino renovation were conducted by either federal or tribal agencies—not state agencies. Stephen Nelson, the Royal River Casino Compliance Office, testified at length about the tribal and federal inspections that occurred during the renovation project and the standards that were used both during and following the project. Stephen Nelson Testimony. Nelson explained that IHS conducted an inspection of each portion of the Casino construction project once that portion was completed. Stephen Nelson Testimony; *see also* Docket 149-1 ¶ 18; Ex. 10-16. Because of this, the renovation complied with federal health, safety, food, and environment standards and regulations and was not completed under any State of South Dakota health standards. Docket 149-1 ¶ 21.

44

Evidence at trial also showed that the State never provided help, funds, training, or inspections to the project. For example, if IHS or a federal agency did not complete the inspection, the Tribe paid private companies to complete the inspection, including inspections for the Casino's fire sprinkler systems, fire alarm systems, and elevators. *Id.* ¶ 22; *see also* Stephen Nelson Testimony; Docket 152-1 at 25, 53-57; Ex. 12-16, 74. Both federal and tribal regulations required the Tribal Gaming Commission to conduct in-person supervision every time construction required the relocation of slot machines. Gilbert Testimony. Evidence also showed that the renovation project was designed to meet the standards of: (a) the 2015 International Building Code; (b) the 2015 International Electrical Code; (c) the 2015 International Plumbing Code; and (d) the 2015 International Mechanical Code rather than any State codes. Docket 149-1 ¶ 44. And the project was designed and built to comply with the federal American with Disabilities Act (ADA). *Id.* ¶ 43.

Apart from the federal and tribal inspections and regulations, Brock Nelson and Stephen Nelson also testified to the daily supervision and security the Tribe provided for the safety of construction employees and guests during the renovation. Stephen Nelson and Brock Nelson Testimony. The security department of the Casino documented 19 incidents relating to the renovation project, none of which involved any state law enforcement response. Brock Nelson Testimony; *see also* Ex. 159-78. Stephen Nelson and Brock Nelson both testified that they monitored the safety of the construction workers during the renovation, and made sure no safety hazards occurred in the construction

45

zone. Stephen Nelson Testimony. The Tribe also required project contractors to notify the Tribe if any employee working on the project was a sex offender and comply with Tribal laws governing sex offender registry. Docket 149-1 ¶ 46. The State did not regulate or monitor the safety of the employees or guests during the renovation project.

Evidence at trial also demonstrated that any and all licenses or permits were issued for the project by either federal or tribal agencies, apart from 1 electrical permit. *See* Ex. 5-7, 35-37, 81, 149-50.[3] For example, the United States Environmental Protection Agency (EPA) issued coverage under the National Pollutant Discharge Elimination System (NPDES) general permit for the renovation project. Docket 149-1 ¶ 45. The South Dakota State Engineer did not issue a building permit for the construction project. *Id.* ¶ 42. Instead, the Tribe issues business licenses to eligible persons doing business within the Tribe's jurisdiction. *Id.* ¶ 50. In 2018, the Tribe passed a resolution to update its business licensing procedures. *Id.* ¶ 49; *see also* Ex. 36. The Tribe issued and required Leo A. Daly and Henry Carlson Company and all subcontractors of Henry Carlson Company to maintain a Tribal Business License. Docket 149-1 ¶ 51; *see also* Ex. 37. As such the Tribe issued Henry Carlson Company and all subcontractors its business license, not the State. Ex. 36-37. And during

---

[3] As discussed in greater detail below, the South Dakota general fund does not fund electrical inspections or permits. Thus, the Tribe's excise tax payment would not fund the 1 permit provided to the Casino renovation by the State, and instead the Tribe's electrical contractor paid separate fees to cover this cost.

the renovation project, the Tribe issued certificates of occupancy, certifying the facility's suitability for occupancy at the conclusion of each project phase. Johnson Testimony. On October 16, 2019, the Tribe issued a Certificate of Occupancy to the Casino. Docket 149-1 ¶ 40; *see also* Ex. 34. The Casino's ultimate facility license and attestation was from the Tribe. *See* Ex. 149-50. The state issued no such licenses or certificates.

Evidence at trial also demonstrated that several of the necessary renovations to the Casino were essential to benefit the health and safety of Indian gaming patrons and workers. During the renovation, new sprinkler heads, water lines, fire suppression system, panels, exit signs, emergency alarm system, and HVAC system were all installed to benefit the safety and health of the Casino's workers and patrons. Stephen Nelson, Morrissey, and McDermott Testimony; *see also* Ex. 73. And most recently, the Tribe had to implement additional safety measures to protect the welfare of its patrons due to the COVID-19 pandemic. Morrissey and McDermott Testimony. This is specifically required in the Class II and Class III Gaming Ordinances approved by NIGC and in IGRA, which note: "the operation [and maintenance] of that gaming [is to be] conducted in a manner which adequately protects the environment and the public health and safety." 25 U.S.C. § 2710(b)(2)(E). The court finds this evidence illustrates the expansion and renovation of the Casino was critical to public health and safety of Indian gaming patrons and workers, consistent with 25 U.S.C. § 2710(b)(2)(E) and the federal interest in the construction and maintenance of Indian gaming facilities.

Apart from the federal and tribal regulation of the actual Casino renovation, evidence at trial also established federal involvement in the financing of the renovation project. $6.075 million dollars of the renovation project financing was funded with Tribal Economic Development Bonds. McDermott Testimony; *see also* Docket 149 ¶ 83. NIGC reviewed the Casino's renovation project financing documents and found that the documents did not constitute gaming management contracts under IGRA in accordance with NIGC standards. Gilbert and McDermott Testimony; *see also* Ex. 155. NIGC found the financing documents did not violate IGRA's requirement that the Tribe have the sole proprietary interest in its gaming activity. The State did not regulate the financing of the project. The court finds this evidence shows additional federal regulatory involvement in the renovation project.

The State's only active regulatory authority under the Tribal-State Gaming Compact at the Casino is to inspect the Casino's slot machines for compliance with state and tribal gaming laws. *See* Ex. 17. The Tribe reimburses the expense of the State in performing this responsibility. Gilbert and Adams Testimony; *see also* Ex. 17, 192. Evidence at trial showed that the State negotiated for the Tribe to make annual payments to Moody County to reimburse the County for "the possibility of increased governmental demand" due to the "significant expansion of the Tribe's gaming operation," but the State did not request any compensation to the State for any burden the Casino expansion would impose, because the State has not had any increased burden.

48

Reider Testimony; Docket 149-1 ¶ 27; Ex. 17. No other active regulatory authority or action on the part of the State was presented at trial.

Based on the above-summarized evidence, the court finds that although not comprehensive, IGRA is extensive in its regulation of Indian gaming. The court finds that there is a strong federal interest in ensuring the quality and safety of Indian gaming facilities while simultaneously advancing tribal self-sufficiency and self-governance. The statutory scheme of IGRA allows tribes to manage the construction and renovation of gaming facilities, while also ensuring the safety and health of Indian gaming patrons and facilities. Here, both federal regulation under IGRA and tribal regulation under the Tribe's laws of the Casino renovation were substantial and extensive, especially when compared to the lack of State regulation. The evidence showed a scheme of federal and tribal regulation of Indian gaming facilities that leaves a minimal role for State oversight of the renovation project. Thus, the court finds there is a strong federal interest in the construction and maintenance of the Casino in a manner that adequately protects the environment and public health and safety as well as a strong federal interest in promoting tribal self-sufficiency and tribal government as articulated in IGRA. *See* 25 U.S.C. § 2702.

The State argued at trial that there is minimal federal interest in the regulation of the construction industry—a field that is typically regulated by states. And the Eighth Circuit noted on appeal that "IGRA is a gambling statute, not a code governing construction contractors, the legalities of which are of paramount state and local concern." *Haeder*, 938 F.3d at 945 (citation

49

omitted). But this argument was rejected by the Supreme Court in both *Bracker* and *Ramah.* In *Ramah*, the Supreme Court held that the construction tax was preempted under federal law not because construction is a federally regulated field or an area in which the federal government has a strong interest, but because the tax "necessarily impede[d] the clearly expressed federal interest in promoting the quality and quantity of educational opportunity for Indians by depleting the funds available for the construction of Indian schools." 458 U.S. at 842. The court held that "[t]here [wa]s nothing unique in the nature of a gross receipts tax or in the federal laws governing the development of tribal self-sufficiency in the area of education that requires a different analysis." *Id.* at 843. So too in *Bracker*, the Supreme Court "struck down Arizona's use fuel tax and motor carrier license tax, not because of any federal interest in gasoline, licenses, or highways," but to "guarantee[] Indians that they will 'receive . . . the benefit of whatever profit [the forest] is capable of yielding[.]' " *Id.* at 841 n.5 (alteration in original) (quoting *Bracker*, 448 U.S. at 149).[4]

     This same reasoning is applicable here. Although the field of construction is not typically federally regulated, the contractor's excise tax necessarily impedes the clearly expressed federal interest in promoting tribal self-sufficiency and tribal governance, adequately protecting public health and

---

[4] At the time of IGRA's enactment in 1988, *Bracker* and *Ramah* were recently decided. Those very decisions, and their implications regarding state taxation, were left intact by Congress in the enactment of IGRA.

safety in Indian gaming facilities, and ensuring the Tribe is the primary beneficiary of Indian gaming. Thus, just as the federal government had minimal federal regulatory interest in the construction industry, state oil, licenses, or highways in *Ramah* and *Bracker*, the federal government has a strong interest in the construction and renovation of the Royal River Casino because the tax "necessarily impedes the clearly expressed federal interest in" "promoting tribal economic development, self-sufficiency, and strong tribal government," "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation," and "protect[ing] such gaming as a means of generating tribal revenue." *Ramah*, 458 U.S. at 842; 25 U.S.C. § 2702. Although the field of construction is not typically federally regulated, there is a strong federal interest in "guaranteeing Indians that they 'will receive . . . the benefit of whatever profit the [Indian gaming facility] is capable of yielding." *Ramah*, 458 U.S. at 841 n.5 (quoting *Bracker*, 448 U.S. at 149). And for the reasons summarized above, IGRA and its scheme of federal and tribal regulation of Indian gaming facilities is evidence of a strong federal interest in the Casino renovation project compared to the lack of State regulation. Thus, after hearing all the evidence during the trial, the court disagrees that the federal government does not have a strong interest in the construction, renovation, maintenance, and safety of Indian gaming facilities and finds the extent of federal regulation and control weighs against imposition of the State excise tax.

### b. Promoting Tribal Economic Development, Ensuring that the Tribe is the Primary Beneficiary of Gaming, and Protecting Gaming as a Means of General Tribal Revenue

After considering the history of tribal sovereignty, the extent of federal regulation and control, and the federal interests of promoting self-sufficiency and strong tribal government articulated in IGRA, the court also considers the federal interests of "promoting tribal economic development," "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation," and "protect[ing] such gaming as a means of generating tribal revenue." *See* 25 U.S.C. § 2702. The court first considers whether the tax impedes the federal interests of promoting economic development and ensuring that the Tribe is the primary beneficiary of the gaming operation at Royal River Casino.

On appeal, the Eighth Circuit held that the State excise tax was "only a small percentage of the gross Casino revenues generated in 2016 and 2017 alone" and that the Tribe failed to show that the tax would "reduce the demand for the Casino's commercial activities." *Haeder*, 938 F.3d at 946. The Eighth Circuit held that, unlike *Noem,* there was insufficient evidence that the "generally applicable . . . one-time tax . . . implicates the relevant federal and tribal interests." *Id.* The Court noted that to support the Tribe's preemption claim under *Bracker*, the Tribe may put forth evidence that the tax would "reduce the demand for the Casino's commercial activities." *Id.*

At trial, evidence established that the effects of the excise tax are not "a one-time tax" and that the tax directly reduced the demand for the Casino's

commercial activities because the burden of the tax is magnified by the amount of interest in escrow and the amount of revenue the Tribe is not able to generate. For example, evidence at trial established that the Tribe has had to forego acquiring additional slot machines due to the imposition of the State excise tax. The $384,436 that the Tribe would have to use to pay the tax is currently held in a Casino escrow account. Kills-A-Hundred and McDermott Testimony. This is because the money was borrowed as part of bond financing entered into by the Tribe to fund the renovation project. McDermott Testimony. The bond financing restricts how funds may be used and limits their use to Casino capital improvements only. McDermott Testimony.

Evidence at trial demonstrated that had the Tribe been able to use the $384,436 currently held in escrow, the Tribe would have purchased 19-20 additional gaming slot machines at about $20,000 per machine. Morrissey Testimony. Because the terms of the Casino's financing also prohibit the Tribe from incurring additional debt, the Casino is not able to borrow additional money to finance the purchase of more machines. McDermott and Morrissey Testimony. If the escrow funds were not used to pay the State excise tax, the Casino would purchase additional slot machines because slot machines are the most profitable use of the funds. Morrissey Testimony. Slot machines produce approximately 80% of the Casino's revenues, and new slot machines are the most profitable gaming assets because they yield a high return with low operational and maintenance costs. McDermott Testimony.

Testimony indicated that those 19-20 slot machines alone would have generated over $1.24 million dollars in revenue for the Casino in 1 year. Morrissey Testimony. Tim Morrissey, Director of Operations at Royal River Casino, explained that a brand-new slot machine in its first few years of service would be expected to generate a daily revenue that would double or quadruple the current house average of $180. Morrissey Testimony. Using an estimate of just $180 as the daily average, and the Casino retaining 90% of said revenue as profit, 20 new machines would provide over $1.24 million dollars in net revenue to the Casino during the first year alone. Morrissey Testimony. This amount significantly increases if one doubles or quadruples the slot machine's profitability, which is typical in the marketplace for brand new slot machines. Morrissey Testimony. This $1.24 million dollars in additional gaming revenue represents at least a 10% increase in the Casino's earnings before interest, depreciation, amortization, and tax, and is substantial compared to the Casino's 2019 annual net income transfer to the Tribe of $4,506,143. Morrissey and McDermott Testimony; *see also* Ex. 157.

Based on this evidence, the court finds that the State excise tax substantially undermines the Tribe's ability to generate revenues from Class III gaming and "reduce[d] the demand for the Casino's commercial activities[.]" *Haeder*, 938 F.3d at 946. Evidence of a loss of at least $1.24 million dollars is substantial and is far from "a small percentage of the [net] Casino revenues"

generated in 2018. *Id.*[5] $1.24 million dollars is more than 25% of the Casino's net income transfer to the Tribe in 2019 of $4,506,143. And this loss is only attributable to the Tribe's inability to fund additional slot machines because of the State excise tax levied on the contractor and passed on to the Tribe. Here, "[t]he Tribe [has] provided evidence that increases [in Casino renovations were] directly tied to increases in gaming activity itself," and thus "[t]he State's taxation of the Casino amenities would . . . reduce tribal revenues from these sales" in direct contradiction to "IGRA's broad policies." *Noem,* 938 F.3d at 936. Thus, the court finds this foregone gaming activity directly impairs the Tribe's ability to conduct Class III gaming and generate gaming revenue in direct contradiction to IGRA's federal goals.

The State argues that the excise tax does not directly apply to the gaming activities at the Casino. But in both *Noem* and *Mashantucket*, this fact was not dispositive and must be balanced with the remainder of the *Bracker* factors. *See* 938 F.3d at 936; 722 F.3d at 472. In *Noem*, the Eighth Circuit held that "[t]he Tribe provided evidence that increases in patronage at one amenity is directly tied to increases in gaming activity itself," and thus "[t]he State's taxation of the Casino amenities would . . . reduce tribal revenues from these

---

[5] The Tribe also introduced evidence at trial that the gross revenue of the Casino does not account for all the costs of operating the Casino. McDermott Testimony. Thus, this court does not compare the excise tax amount of $384,436 or the loss of at least $1.24 million dollars in gaming revenue to the gross Casino revenue, but instead compares it to the Casino's actual net revenue that is then transferred to the tribal government. *See Haeder*, 938 F.3d 946 (considering the gross Casino revenue and not the net Casino revenue).

sales" in direct contradiction to "IGRA's broad policies of increasing tribal revenues through gaming and ensuring that tribes are the primary beneficiary of their gaming operations[.]" 938 F.3d at 936. The Court noted that where the taxed activity "contribute[s] significantly to the economic success of the Tribe's Class III gaming at the Casino," the State tax's "impact would be contrary to IGRA's broad policies[.]" *Id.*

Here, the Tribe established that the State tax has reduced the Tribe's ability to increase its slot machine total to 800 machines. The project planned to provide the Casino gaming floor with the capacity of approximately 800 slot machines. Docket 149-1 ¶ 39. When the renovation project started, the Tribe operated 425 Class III slot machines and 11 table games at the Casino. *Id.* ¶ 31. Because of the tax, the Casino still operates only about 425 machines, roughly the same number as prior to the renovation. Morrissey and McDermott Testimony. And, as discussed above, the $384,436 that the Tribe would use to pay the contractor's excise tax could purchase 19-20 additional slot machines that would generate a conservative estimate of at least $1.24 million dollars per year. This is evidence that the renovation of the gaming floor alone to house additional slot machines is "directly tied to increases in gaming activity itself." *Noem*, 938 F.3d at 936.

Apart from the Tribe's inability to purchase 19-20 new slot machines, evidence at trial also established that the expansion and modernization of the casino facility "is directly tied to increases in gaming activity itself" and contributed significantly to the economic success of the Tribe's Class III gaming

56

at the Casino. *Id.*; *see also* Morrissey Testimony. The renovation project included (a) expanding the gaming floor; (b) upgrading the Casino's overall electrical system to accommodate additional slot machines; (c) replacing the Casino roof; (d) replacing the Casino's HVAC system; (e) renovating and updating the Casino's finishes and fixtures; (f) relocating and replacing the Casino's bar and lounge to the middle of the gaming floor; (g) adding a VIP gaming lounge with gaming and food, beverage, and bar service; (h) renovating the casino cage area, snack bar, restaurant; (i) renovating the hotel, hotel lobby, and corridor connecting the gaming floor and hotel; and (j) constructing a new administration building to house the Casino's operation departments. Docket 149-1 ¶ 38; *see also* Ex. 32-33.

Morrissey testified at trial that the renovation of the Casino facility was critical to increasing gaming revenue in the face of the Casino's declining market share due to increased competition with a newer and larger Casino built in nearby Larchwood, Iowa. Morrissey Testimony. Morrisey, Stephen Nelson, McDermott, and Dave Derry testified at length as to the failing components, outdated finishes, and other deteriorating conditions of the Casino that were reducing gaming revenue. And because the Casino had not been renovated in nearly 20 years and was outdated, the Casino was forced to offer more "comps" to patrons in order to attract patrons to the facility. This of course also decreased the net income of the Casino and the revenue transferred to the Tribe.

But following the renovation and modernization, the Casino has seen an increase in market share. Morrissey Testimony. Because of the renovation, the Casino has been able to reduce its marketing expenditures and "comps." Morrissey Testimony. Both of these have led to an increase in total net income at the Casino. Morrissey Testimony. And because of the hotel renovation, the Casino has been able to double the daily rate and improve occupancy. Morrissey Testimony. Casino revenue has increased since the beginning of the renovation project, with guest feedback indicating that it is the result of the completed renovations. Docket 149-1 ¶ 75. Thus, evidence at trial established that the expansion and modernization of the casino facility contributed significantly to an increase in gaming activity and the economic success of the Tribe's Class III gaming at the Casino. As such, the court finds the Casino renovations are directly tied to increasing gaming revenue.

Apart from considering whether the excise tax reduced the Casino's ability to generate gaming revenue, the court also considers whether the tax impedes the federal interest of protecting gaming as a means of general tribal revenue. Here, Casino revenue is the largest non-federal source of funds to the Tribal government, comprising approximately 40% of the Tribe's income in 2018 and 25% of the Tribe's budget in 2019. Docket 149-1 ¶ 62; *see also* Kills-A-Hundred Testimony. Federal funding accounts for approximately 75% of the Tribe's income. Kills-A-Hundred Testimony. The Casino distributed over $4.5 million to the Tribe in 2019. McDermott Testimony; *see also* Ex. 157.  In 2018, the Casino distributed $7.6 million to the Tribe, and in 2017, the Casino

distributed $10.4 million. McDermott Testimony; *see also* Ex. 157. The decrease in distribution of gaming revenue to the Tribe in 2019 is due to Casino revenue paying the renovation financing bonds first. Kills-A-Hundred Testimony; *see also* Ex. 157. In *Noem*, the Eighth Circuit found that a use tax's "impact would be contrary to IGRA's broad policies" in part because of the tribal distributions from the Casino net revenue. 938 F.3d at 936. The facts are nearly identical here.

The Tribe has adopted a Law and Order Code and other Ordinances that regulate the conduct of individuals and entities on the Reservation. Docket 149-1 ¶ 28; *see also* Ex. 19. Within the Law and Order Code, the Tribe has adopted a federally-approved Amended Gaming Revenue Allocation Plan under which the Tribe allocates gaming revenue from the Casino. Docket 149-1 ¶¶ 29-30; *see also* Ex. 20-21. The Amended Gaming Revenue Allocation Plan was approved by the United States Department of Interior on March 26, 2018. Docket 149-1 ¶ 30; *see also* Ex. 22. The Ordinance states the essential purpose of the Royal River Casino: "B. Tribal Government and Tribal Economic Development. The Flandreau Santee Sioux Tribe shall use revenues generated by tribal gaming primarily to strengthen government, tribal self-sufficiency and to support tribal economic development." Ex. 21.

In pursuit of these objectives and aligned with the goals of IGRA, the Ordinance allocates gaming net revenue from the Casino as follows: (a) individual tribal member per capital payments: (40%); (b) tribal economic development: (35%); (c) tribal government operations: (15%); (d) minor's trust

fund: (5%); (e) community assistance fund: (4%); and (f) higher education fund: (1%). Docket 149-1 ¶ 29; *see also* Ex. 20-21. Prior to 1% of the Casino net revenue going to the higher education fund, 1% was dedicated to a local government fund from which the Tribe paid Moody County and the City of Flandreau for expenses such as law enforcement vehicles, dispatch, and ambulance services. Kills-A-Hundred Testimony.

The Tribe utilizes proceeds from the Casino to help fund a variety of on-reservation and tribal projects. Tribal Treasurer, Ryan Kills-A-Hundred, and President Anthony Reider testified at length about the significance of Casino revenue, discussing how the revenue funds essential government programs the Tribe would otherwise not be able to operate. Reider and Kills-A-Hundred Testimony. Casino revenue provides stability to the Tribe and Tribal government operations during gaps in federal appropriation. Kills-A-Hundred Testimony. And virtually all government services on the reservation are provided or funded by the Tribe, such that $384,436 or at least $1.24 million dollars of lost Casino revenue is a substantial loss to the tribal budget.

For example, Casino revenue funded development costs for the construction of the Tribe's new health clinic, which provides comprehensive health services to eligible patients across the region, and extends eligibility to not only tribal members, but members of any federally-recognized tribe, their spouses, children, and in some cases non-Indians living in the household. Kills-A-Hundred and Jacobs Testimony; *see also* Docket 152-6 at 13-14. The Tribal police department provides law enforcement services on the reservation.

60

Ex. 44-45, 53. And the Tribe operates a judicial system, including criminal

civil, and juvenile court. Ex. 132, 135-37.

Gaming revenue also funds the Tribe's comprehensive array of social

services, including meals for the elderly and elderly care, tribal transportation,

domestic violence victim assistance, housing, community center, general

welfare funds, and most recently COVID emergency assistance. *See* Kills-A-

Hundred Testimony; Morson Testimony; *see also* Ex. 50, 120-122, 142-47.

Many of these services are provided to Tribal members and non-members both

on and off-reservation. Morson Testimony. For example, the Tribe supports

State parolees in Moody County, regardless of their tribal membership, with

medical, financial, and job support. Morson Testimony. Gaming revenue also

funds Tribal housing programs that provide rental homes to federally

recognized tribal members, elderly housing complexes to Tribal and non-tribal

members, and below-market rental units for Tribal and non-tribal members.

Kills-A-Hundred and Marshall Testimony; *see also* Ex 143. The Tribe also

recently implemented a COVID isolation assistance program that provides cash

payments and other assistance to any person in Moody County. Reider and

Morson Testimony; *see also* Ex. 147. Through the COVID assistance program,

the Casino provides quarantine housing and meals. Reider, Kills-A-Hundred,

and Jacobs Testimony. Evidence at trial demonstrated that none of these social

service programs receive funding from the State. Kills-A-Hundred and Morson

Testimony.

Similarly, although some governmental services that the Tribe offers are not available to non-Indians, the Tribe utilizes proceeds from the Casino to fund off-reservation projects in the local Moody County community. Docket 147 ¶ 28; Reider Testimony. The Tribe also enters into agreements with local and state government agencies and volunteer fire departments to coordinate services on and off-reservation, as well as reimburse local non-Tribal agencies for providing services to tribal members. Reider Testimony; *see also* Ex. 40, 48-49, 51-52, 54-56. For example, the Casino budgets and funds around $1,500 per month of donations to community programs and organizations. Docket 149-1 ¶ 64. The Tribe pays the Moody County Sheriff's Department approximately $15,000.00 per year for law enforcement dispatch services. Docket 149-1 ¶ 70; *see also* Ex. 40, 49. The Tribe funded approximately 50% of the Moody County dispatch system upgrade. *Id.* ¶ 71. The Tribe's on-reservation gun range is used by both the City of Flandreau and Moody County law enforcement departments for training purposes. *Id.* ¶ 72. The Tribe maintains and funds 3 Mile Road, and other roads, highways, streetlights, and walkways that are all off-reservation. *See* Ex. 56, 102, 104-07. The Tribe funds ambulance and paramedic services, dispatch services, and fire protection on the reservation. The Tribe also funds several local but off-reservation services, including purchasing 5 fire trucks for the City of Flandreau's Fire Department, providing funding for teacher salaries and supplies to off-reservation public schools, and funding the construction and maintenance of off-reservation roads. Reider Testimony; *see* Ex. 139.

The programs and services provided by the Tribe both on and off-reservation to tribal members and non-members demonstrate the Tribe's use of gaming revenues toward IGRA's goals of  "promoting tribal economic development, self-sufficiency, and strong tribal government[]," and "protect[ing] such gaming as a means of general tribal revenue." *See* 25 U.S.C. § 2702. The Tribe provides, funds, and operates essential government services available both on- and off-reservation, all funded with tribal and federal funds. Reider and Kills-A-Hundred Testimony; *see also* Ex. 44-45, 47, 53, 89, 91, 94-98, 108-35. On appeal, the Eighth Circuit held that "the Tribe . . . failed to show [at the summary judgment stage] that the tax ha[d] more than a *de minimis* financial impact on . . . tribal interests[.]" *Haeder*, 938 F.3d at 947. Based on the above summarized evidence, the financial burden put on the Tribe from the loss of at least $384,436 to the tribal budget and tribal interests is substantial. And the loss of at least $1.24 million in gaming revenue from the additional slot machines is an even greater burden on the tribal budget.

The tax's economic burden on the Tribe is in contrast to the indirect economic burdens the Supreme Court dismissed in *Cotton Petroleum. See* 490 U.S. at 186-87 (noting that the "marginal effect[s] on the demand for on-reservation leases, the value to the Tribe of those leases, and the ability of the Tribe to increase its tax rate" are impacts that are "simply too indirect and too insubstantial to suppose [a] claim of pre-emption."). The burden here is also unlike the tax in *Mashantucket*, where the Court found the tax of only $20,000 per year paled in comparison to the billion-dollar casino revenue. 772 F.3d at

63

474. Instead the State contractor's excise tax is much more than $20,000 per year, and the Casino generates far less net revenue to provide to the Tribe than the billion-dollar operations in *Mashantucket*. Here, the Casino's 2019 annual net income transfer was $4,506,143. Morrisey and McDermott Testimony; *see also* Ex. 157. With Casino revenue, the Tribe has more than a "skeletal [budget] that is totally dependent on Federal funding," and can provide essential programs to its members and the local community. *City of Duluth*, 785 F.3d at 1211. Thus, the court finds that the State excise tax significantly impedes the federal interest of protecting gaming as a means of general tribal revenue.

After considering congressional intent and the federally stated goals articulated in IGRA of "promoting tribal economic development, self-sufficiency, and strong tribal government[]," "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation," and "protect[ing] such gaming as a means of general tribal revenue," while cognizant of the history of tribal sovereignty and the history of tribal independence in the operation of on-reservation gaming, the court concludes that the State excise tax has a significant effect on federal interests in Indian gaming. *See* 25 U.S.C. § 2702. Although not exclusive or pervasive, there is extensive federal regulation in tribal gaming, and more specifically, tribal casino construction and maintenance. These federal regulations promote tribal self-sufficiency and tribal government while ensuring the Tribe is the primary beneficiary of gaming revenue and protecting gaming as a means of generating revenue for the Tribe. The Tribe put forth evidence, most significantly, that as a result of the additional tax burden on the

64

Casino renovation, the Tribe had to forego purchasing or even leasing and installing additional slot machines in the Casino. This evidence shows the Tribe was deprived of at least $1.24 million dollars in gaming revenue, a substantial amount of revenue compared to the Casino's 2019 annual net income transfer of $4,506,143, impeding the clearly expressed federal interests of IGRA. Thus, the court finds the federal interests weigh against the imposition of the State excise tax.

### 2. Tribal Interests

Against the historical backdrop of tribal sovereignty and strong federal interests, the court must next weigh the tribal interests at stake and the economic burden of the State contractor's excise tax. *See Bracker*, 448 U.S. at 145; *see also Cotton Petroleum*, 490 U.S. at 176-77; *Ramah*, 458 U.S. at 838. Overlapping with the federal interests at issue, here, the tax implicates the tribal interests in tribal economic development and tribal sovereignty. The parties dispute the impact the tax has on both. First, the court considers the economic burden of the State excise tax.

### a. Economic Burden of State Tax

Courts frequently consider the economic burden of the State tax when engaging in the *Bracker* balancing analysis. For example, in *Bracker*, *Ramah*, and *Cotton Petroleum*, the Supreme Court found that the economic burden of the state taxes fell on the entity that was directly responsible for the amount of taxes paid to the States. In both *Bracker* and *Ramah*, because the Tribes were obligated to reimburse the non-Indian entities, the cost and economic burden

of the asserted tax ultimately fell on the Tribes. *See Bracker*, 448 U.S. at 140; *Ramah*, 458 U.S. at 835. By contrast, in *Cotton Petroleum* the Tribe did not reimburse or compensate the non-Indian entity that paid the taxes without protest, and thus, the economic burden did not fall on the Tribe. *See* 490 U.S. at 168.

Here, the court finds that the facts at trial established that the economic burden of the tax fell on the Tribe, similar to the economic burdens in *Bracker* and *Ramah*. Under SDCL § 10-46A-1, a contractor's gross receipts are subject to a 2% state excise tax. SDCL § 10-46A-1. The legal incidence of the contractor's excise tax is on the contractor. Docket 147 ¶ 9. For purposes of the imposition and assessment of a contractor's excise tax, the State of South Dakota deems the location of the contractor's services to be the location of the project. Docket 149-1 ¶ 47. Here, evidence at trial established that the Tribe ultimately bore the economic burden of the tax, because the Tribe reimbursed Henry Carlson Company for the full amount of the State excise tax. Breck, Derry, and Kills-A-Hundred Testimony. This is similar to the facts of *Ramah*, where although the construction company initially paid the state tax, the company "was reimbursed by the [tribe] for the full amount paid" and thus the court found that the economic incidence of the tax ultimately fell on the tribe. 458 U.S. at 835. Thus, the fact that the economic burden of the tax fell on the Tribe weighs against the imposition of the State excise tax.

**b. Tribal Sovereignty and Self-Determination**

Consistent with the federal interest stated in IGRA of "promoting tribal . . . self-sufficiency, and strong tribal government[]," the court also considers the tribal interests of self-sufficiency and tribal sovereignty. *See* 25 U.S.C. § 2702. The Supreme Court has noted that:

> In part as a necessary implication of [the] broad federal commitment [to tribal sovereignty], we have held that tribes have the power to manage the use of [their] territory and resources by both members and nonmembers . . . to undertake and regulate economic activity on the reservation . . . and to defray the cost of governmental services by levying taxes . . . . Thus, when a tribe undertakes an enterprise under the authority of federal law [like IGRA], an assertion of State authority must be viewed against any interference with the successful accomplishment of the federal purpose.

*Mescalero*, 462 U.S. at 335-36.

Here, the Tribe is governed by its Constitution that was ratified and approved in 1934 by the United States in accordance with the Indian Reorganization Act. Reider Testimony. The Tribe has an extensive civil and criminal code that governs conduct within the Tribe's jurisdiction, including a tribal Tax Act and Gaming Revenue Allocation Ordinance. *See* Ex. 19, 21, 43. The Tribe provides the governmental services, discussed above under Tribal law, and funds the services from tribal and federal moneys. Reider and Kills-A-Hundred Testimony. The Tribe's Gaming Revenue Allocation Ordinance states another essential purpose of the Royal River Casino:

> C. Preservation and Strengthening of Flandreau Santee Sioux Society, Economy, and Culture. The Tribe shall work to reverse the lasting effects of the termination policy of the 1950s and 1960s which promoted migration away from the Reservation in an effort to encourage and expedite assimilation of Indian people into non-Indian society. The Tribe is committed to strengthening its

> Reservation community socially, economically, and culturally in its
> continuing efforts to realize its goal of self determination.

Ex. 21. As discussed at length above, the tax impedes the Tribe's interest in

self-determination because the Tribe is not able to fully realize its gaming

revenue and allocate said funds where the Tribe sees best fit. Instead of

funding the many on- and off-reservation programs and services previously

discussed, the Tribe was forced to put the amount of excise tax in escrow. This

impedes the Tribe's ability to self-govern and spend tribal gaming revenue how

the tribal government directs.

But apart from the tax interfering with the Tribe allocating gaming

revenue, the tax also interferes with the Tribe's ability to make its own laws

and be governed by them, most specifically the Tribe's Tax Act. The Tribe's Tax

Act regulates taxation within tribal jurisdiction, imposing tribal sales and use

tax, motor vehicle fuel tax, and taxes on cigarettes, utilities, communication,

and other products. Reider and Kills-A-Hundred Testimony; *see also* Ex. 43.

Within the Tax Act, the Tribe does not impose a contractor's excise tax. Reider

Testimony; see Ex. 43. Testimony at trial established that the Tribe owns all

the buildings on the reservation because the reservation is exclusively

comprised of trust land. Reider Testimony. Because of this, the Tax Act does

not impose an excise tax because imposition of a tribal contractor's excise tax

would be taxing the Tribe itself. *See* Reider and Kills-A-Hundred Testimony.

Taxing itself would be acting in direct contradiction to the purposes of taxation

outlined in the Tribe's Tax Act and would impede the Tribe's goals. Reider

Testimony; *see also* Ex. 43.

Bobbi Adams with the South Dakota Department of Revenue testified regarding the State's ability to enter into a tax agreement with South Dakota Tribes. Adams Testimony. Based on Department of Revenue policy, however, the Tribe must impose the same type of taxes within their tribal tax code as the State imposes to be able to enter into a tax collecting agreement with the State. Adams Testimony. Here, the Tribe made a self-governing decision to not impose a tribal contractor's excise tax that would result in the Tribe taxing itself. *See* Ex. 43. Because of this self-governing decision, the Tribe is penalized by its inability to enter into a tax agreement with the State and qualify for a contractor's excise tax exemption through a negotiated tax agreement. Thus, the court finds the State excise tax also infringes on tribal sovereignty and the Tribe's right to self-govern.

Apart from the tax interfering with the Tribe's Tax Act, the tax also interferes with the Tribe's negotiated Amended Gaming Compact. As previously discussed, trial testimony established that the Casino renovation was necessary because the original gaming floor lacked the space and necessary electrical components to increase the number of slot machines on the floor to compete with the new gaming facility Larchwood. Morrissey and McDermott Testimony. The Tribe negotiated an Amended Gaming Compact, which increased the number of slot machines allowed, in part because slot machines generate the largest amount of net gaming revenue at the Casino. McDermott Testimony; *see also* Ex. 151-52, 157. Thus, the renovation made room to increase the Casino's slot machine capacity to 800 machines and also added a

69

second electrical room and dedicated network connections and circuits for each additional slot machine in order to take full advantage of the Amended Gaming Compact. Morrissey Testimony.

Although the renovation only allowed the Tribe space for 800 slot machines, the Amended State Gaming Compact authorized up to 1,000 machines. Docket 149-1 ¶ 25. Article 11.2 of the Gaming Compact requires the Tribe to make an annual contribution to Moody County "due to the possibility of increased governmental demand . . . for government services" in increasing amounts according to the number of Class III slot machines in operation during the previous year: $75,000.00 for 500-699 machines; $150,000.00 for 700-849 machines; $250,000.00 for 850-999 machines; and $350,000 for 1,000 machines. *Id.* ¶ 27.

Here, if both the Tribe and the State seek to receive the benefits of the negotiated Amended Gaming Compact, the Tribe must be able to purchase additional slot machines, which, for the reasons discussed above, the Tribe is unable to do. Thus, the State tax impedes the Tribe's interests as negotiated in the Amended Gaming Compact. And if the Tribe and State seek to receive the full benefits of the negotiated Amended Compact, a second renovation will be necessary so that the Casino can house all 1,000 slot machines, and another excise tax will be imposed by the State, meaning the excise tax will not be a single, one-time tax. Also, to keep up with competitive regional gaming facilities, other renovations may be necessary. Morrissey Testimony. Thus, every time a renovation is needed, the State will impose an excise tax. This

70

infringes on the Tribe's self-governance and the Amended Gaming Compact, and this shows the incidence of the tax is more than a single, one-time tax. *See Haeder*, 938 F.3d at 946.

Finally, the court considers the Tribe's ability to hold and conduct tribal government meetings at the Casino. Evidence at trial established that phase 1 of the renovation project included construction of an administration building. Reider Testimony; *see also* Ex. 27, 197. The Tribe regularly conducts tribal government meetings, such as the Tribal Executive Committee meeting, at the Casino administration building. Reider Testimony; *see also* Ex. 197; Docket 152-1 at 74. Due to a roof leak and the lack of videoconferencing and other technological capabilities at the Tribe's main building, the Casino administration building is essential to tribal government operations. Reider Testimony. Taxing this phase of the construction, thus, directly interferes with the Tribe's ability to self-govern, placing an economic burden on the Tribe's ability to perform essential governmental operations.

Based on the evidence presented at trial, the court finds that the State excise tax directly interferes with the Tribe's right to make and be governed by its own laws. The tax interferes with the Tribe's self-determination and ability to allocate gaming revenue how it sees fit. The tax also interferes with the Tribe's decision to not tax itself through the Tribal Tax Act. The tax impedes the Tribe's ability to purchase additional slot machines, interfering with the Tribe's ability to realize the full benefits of the Tribe's negotiated Amended Gaming Compact with the State. And the tax places an economic burden and

71

directly interferes with the Tribe's ability to conduct tribal government meetings in the Casino administration building. Thus, the court finds the State excise tax interferes with the Tribe's interests in tribal self-sufficiency, self-determination, and sovereignty.

### c. Tribal Economic Development

Finally, apart from the direct economic burden that falls on the Tribe and the Tribe's self-governance, courts also consider the financial impact a tax has on a Tribe and the Tribe's economic development. For the same reasons discussed in the federal interest section, the court finds the State excise tax interferes with the Tribe's own interest in economic development. The funds that the Tribe would use to pay the State tax and the significant gaming revenue of at least $1.24 million dollars that the Tribe loses as a result of the State excise tax impacts the Tribe's ability to economically develop and provide essential government services both on and off-reservation. Incorporating the reasoning outlined above, the court finds the State excise tax interferes with the Tribe's own interest in economic development and "ensuring tribal control of gaming operations in Indian country[.]" *Haeder*, 938 F.3d at 946. Thus, the court finds the tribal interests weigh against the imposition of the State excise tax.

### 3. State Interests

Lastly, the court must consider South Dakota's interests and asserted justifications for imposing the excise tax. "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and

tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." *Noem*, 938 F.3d at 935-36 (quoting *Mescalero*, 462 U.S. at 334). Here, on appeal, the Eighth Circuit concluded that because the State had a "legitimate interest[] in raising revenues for essential government programs that benefit the nonmember contractor-taxpayer" and the State's "interest in being able to apply its generally applicable contractor excise tax throughout the State," these interests were sufficient to impose the excise tax. *Haeder*, 938 F.3d at 946-47. Thus, the court considers 3 main justifications for imposing the excise tax: (1) the State's interest in reimbursement for the governmental functions and services performed and provided by the State to the Tribe and the non-Indian contractor both on- and off-reservation; (2) the State's interest in raising revenue; and (3) the State's interest in the uniform, equal application of the excise tax.

### a. Reimbursement for State Government Services

First, the court considers services the State provides on-reservation to the Tribe, Henry Carlson Company, or in connection to the Casino renovation project. Generally, to justify the imposition of a state tax on non-Indian entities doing business on Indian land, a state must show that it "seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall." *Bracker*, 448 U.S. at 150. "The exercise of state authority which imposes additional burdens on a tribal enterprise must ordinarily be justified by functions or services performed by the State in connection with the on-

73

reservation activity[.]" *Mescalero*, 462 U.S. at 336 (citations omitted). The presence or absence of a specific "nexus between the taxed activity and the government function[s] provided" is relevant when weighing the State's interests. *Haeder*, 938 F.3d at 946 (quoting *Yee*, 528 F.3d at 1193). Thus, the State interest strengthens where a nexus is established, and is "heavily discounted" where a nexus is absent. *Id.*

In both *Bracker* and *Ramah*, the Supreme Court stated it was "unable to identify any regulatory function or service performed by the State that would justify the assessment of [state] taxes[.]" *Bracker*, 448 U.S. at 148-49. Instead, the Supreme Court found "complete abdication or noninvolvement of the State in the on-reservation activity." *Cotton Petroleum*, 490 U.S. at 185. This is in contrast to the "substantial services" the Supreme Court found were provided to the Tribe and non-Indian contractor by the state to the on-reservation oil and gas operations in *Cotton Petroleum*. *See id.*

Here, the State of South Dakota provides governmental services to individuals and groups throughout the State. Docket 147 ¶ 27. Because the State may only "assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax," the only relevant state governmental services are those funded by the tax in question. *Ramah*, 458 U.S. at 843. The parties stipulated that the only State governmental services that are relevant to this action are State services that are funded by the State general fund and services of the Department of Revenue Business Tax Division that are funded directly by the tax collected.

Docket 149-1 ¶ 57. A number of State agencies are not funded with State general funds and thus are not funded with the contractor's excise taxes collected by the State of South Dakota. *Id.* ¶ 58. Departments not funded by the State excise tax include the Department of Labor and Regulation's Division of Insurance, the Department of Labor and Regulation's Division of Banking, the Department of Labor and Regulation's Electrical Commission, the Department of Labor and Regulation's Plumbing Commission, the Department of Labor and Regulation's Board of Technical Professions, and the Unified Judicial System's Board of Bar Examiners. *Id.*

At trial, the State presented no evidence that South Dakota used revenues from the State general fund to provide any particular service to the Tribe, the Royal River Casino, or Henry Carlson Company during the on-reservation renovation project. No evidence was presented that South Dakota had a "specific, legitimate regulatory interest" in the activity covered by the excise tax—that is, the construction of casino facilities on tribal lands. *See Ramah*, 458 U.S. at 843. Instead, as discussed in the federal interest section, evidence showed the State played no role in regulating the renovation project. Much like the facts of *Ramah* and *Bracker*, evidence presented at trial showed "complete abdication or noninvolvement of the State in the on-reservation activity." *Cotton Petroleum*, 490 U.S. at 185. "The State['s] . . . legitimate governmental interest in raising revenues" for essential government programs is "strongest when . . . the taxpayer is the recipient of state services." *Colville*, 447 U.S. at 157. Thus, the court finds the absence of any on-reservation State

75

services or regulations provided to the Tribe, Henry Carlson Company, and the Casino renovation project demonstrates a lack of State interest in the taxed activity.

At trial, the State argued that services such as licensing for attorneys, notaries, and plumbers, and the supervision of parolees who work for the Casino or Henry Carlson Company were services that benefit the Tribe and Henry Carlson Company in the on-reservation construction project. The State pointed to the fact that four building specifications for the renovation project required certain professionals to be "licensed in South Dakota" or "legally qualified to practice in the jurisdiction where the project is located." Docket 147 ¶ 8. The court disagrees.

First, testimony at trial established that the existence of a South Dakota license was not the controlling factor when selecting subcontractors for the renovation project. Derry Testimony. Second, attorneys, plumbers, and notaries involved in the renovation project maintain licenses in South Dakota for their own general purposes and did not become licensed specifically for the on-reservation renovation project. Derry Testimony; *see, e.g.*, Docket 152-2 at 44. And more importantly, the only State governmental services that are relevant to this action are State services that are funded by the State general fund and services of the Department of Revenue Business Tax Division that are funded directly by taxes collected. Docket 149-1 ¶ 57. A number of licenses highlighted by the State are not funded with State general funds and thus are not funded with contractor's excise tax at issue. *Id.* ¶ 58; *see also* Docket 152-

15 at 8-9 (discussing architect and engineer licensure); Docket 152-16 (discussing insurance regulation); Docket 152-17 at 9-15 (discussing plumbing licensure). Departments not funded include the Department of Labor and Regulation's Division of Insurance, the Department of Labor and Regulation's Division of Banking, the Department of Labor and Regulation's Electrical Commission, the Department of Labor and Regulation's Plumbing Commission, the Department of Labor and Regulation's Board of Technical Professions, and the Unified Judicial System's Board of Bar Examiners. Docket 149-1 ¶ 58. Thus, State services funded by user fees and not by the State general fund are not implicated by the tax or considered in the *Bracker* balancing test.

The State also argued that references within the renovation contract documents to South Dakota standards for materials, such as concrete, show a State interest. But this fact does not show the State provided regulation or services to the Casino renovation project. As discussed in the federal interest section, the Tribe selected the building standards and codes that governed the renovation project. Derry and Johnson Testimony; *see also* Docket 152-2 at 32; Docket 149-1 ¶¶ 41, 44. Project plans and specifications were never submitted to the State Engineer for review, nor was a State building permit issued or required. Derry Testimony; *see also* Docket 149-1 ¶ 42. Although an off-reservation construction project would typically include a State stormwater permit, State mechanical and fire inspections, State department of health inspections, and other State action, the Casino renovation had no such State

involvement. Derry and Johnson Testimony; *see also* Docket 152-2 at 11-12, 34, and 63; Docket 152-10 at 21.

Regardless of whether the Tribe chose South Dakota building codes or licensed professionals to work on the renovation project, all regulation of the project was conducted by federal and tribal agencies—not the State. All of the State witnesses from State agencies that receive funding from the State general fund testified that to their knowledge their agency (a) has never provided services to the Casino renovation project; (b) does not have an office at the Casino; (c) has never visited the Casino on official agency business; and (d) has no connection to the Casino renovation project. And every Tribal official and representative of Henry Carlson Company who testified stated they were not aware of any State service provided to the Tribe, Henry Carlson Company, or the Casino in connection with the renovation project with the sole exception of 1 electrical permit. Derry and Johnson Testimony. And although there was 1 State electrical permit issued to the project, no evidence was presented by the State that electricians or the licensure of electricians are funded by the State general fund. Instead, evidence was presented that the Electrical Commission and electrical permits are entirely funded by fees, not the State general fund. Derry Testimony; *see also* Docket 152-14 at 9. And the State agreed to exclude evidence of State services not funded by the contractor's excise tax, which includes this electrical permit. Docket 149-1 ¶ 58; *see also* Docket 149-4 at 8-9.  Thus, this singular State permit provided to the Casino renovation is not implicated by the application of the contractor's excise tax.

Finally, no evidence was presented at trial that the State incurred on- or off-reservation costs specifically related to the Casino renovation project warranting a reimbursement. In fact, the evidence established the costs of inspection and supervision of the project were fully born by the Tribe. Although 1 building specification for the renovation project identified that certain items should be preassembled "in the shop to the greatest extent possible," there is no evidence that any construction occurred off-reservation or that the State incurred costs related to the construction or renovation. Docket 147 ¶ 6. In fact, trial testimony established that no off-site preassembling occurred. Derry Testimony. And even if preassembling had occurred, the State imposes contractor's excise tax based on the location of the project, regardless of whether work was done off-site. Docket 149-1 ¶ 47; Docket 166-2 at 34; *see* Adams Testimony.

Evidence also failed to establish any additional cost to the State roads that lead to the reservation during the project. The State's maintenance of roads off-reservation is funded by state and federal fuel taxes. Liza Clark Testimony. The Tribe, tribal members, and Henry Carlson Company pay fuel tax every time they purchase fuel in South Dakota whether on or off-reservation. Liza Clark, Adams, Kills-A-Hundred, McDermott, Johnson Testimony. The State roads were not constructed for the Casino, but instead were built decades before, and traffic data highlights that Casino guests and contractors working on the renovation project are only a small fraction of the traffic on the roads. Anderson Testimony. And the Tribe pays license plate fees,

title transfer fees, and lien notation fees for all tribal vehicles, including Casino vehicles. Docket 149-1 ¶ 69. As such, the court finds that the State's funding of roads is reimbursed by direct payment from the Tribe or Henry Carlson Company in fuel tax and other fees.

Based on the above-summarized evidence, the court finds that contributions by the State to the on-reservation Casino renovation project, if any, were sporadic, indirect, and *de minimis*. The State failed to show any substantial or legitimate regulatory function or service that it performed or provided to the renovation project. This is in part due to the policies of IGRA, which supports tribal sovereignty such that states may only exercise authority if a tribe agrees to state regulation in a compact. No State witness testified with certainty to any service provided to tribal members or the Tribe at the Casino to establish a nexus between the taxed activity and the State tax. Instead, evidence presented "noninvolvement of the State in the on-reservation activity." *Cotton Petroleum*, 490 U.S. at 185. The court finds that none of the services provided by the State from the State general fund have "a nexus between the taxed activity and the government function provided[.]" *Yee*, 528 F.3d at 1193. And without State services provided to the Tribe or Henry Carlson Company having a nexus to the Casino renovation project, the State seeks to tax on-reservation activity while providing nothing of value in return. *See Ramah*, 458 U.S. at 843-44. Thus, the court heavily discounts the State's interest in the absence of this nexus. *See Haeder*, 938 F.3d at 946.

80

Next, the court considers the State's off-reservation services provided to the Tribe, tribal members, or Henry Carlson Company. "A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate State intervention." *Mescalero*, 462 U.S. at 336 (citations omitted). On appeal, the Eighth Circuit found that the State had "significant interest in raising revenue for its general fund to provide services to residents including the Henry Carlson Company[.]" *Haeder*, 938 F.3d at 946. Although the Court agreed that a State's interest in raising revenue is "strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services," the Eighth Circuit found that the "relevant services provided by the State include those that are available to the [Henry Carlson Company] and the members of the Tribe off the reservation as well as on it." *Id.* (quoting *Colville*, 447 U.S. at 157 and *Cotton*, 490 U.S. at 189). Thus, the court considers relevant services available to Henry Carlson Company and members of the Tribe both on and off-reservation.

The State argued at trial that the State provides a variety of services to the Tribe, tribal members both on- and off-reservation, and Henry Carlson Company off-reservation. But at trial, no State witness testified with certainty to any State service that is utilized by tribal members, the Tribe, or Henry Carlson Company. Although the State highlighted that tribal members could use State services funded by the State general fund, no State witness testified to any Tribal member taking advantage of said services. For example, Heather Forney, South Dakota Board of Regents' finance officer, provided no evidence

that Flandreau Santee Sioux Tribe tribal members or individuals associated with Henry Carlson Company attend South Dakota Board of Regents' institutions, the South Dakota School of the Blind, the South Dakota School for the Deaf, or take advantage of any of said institutions' services. Thus, no evidence was introduced that tribal members, Henry Carlson Company employees, or the Casino renovation project used Board of Regents general fund allocated resources. Likewise, Reed Holwegner, Director of South Dakota's Legislative Research Council provided no evidence that the Tribe or tribal members or Henry Carlson Company had used any of the services provided by the Legislative Research Council. And Doug Clark, Secretary of the South Dakota Department of Corrections provided no evidence that a state parolee worked on the Casino renovation project.

Greg Sattizahn with the South Dakota Unified Judicial System provided no evidence that any state court case in the South Dakota Unified Judicial System is related specifically to the Casino renovation project, or that any South Dakota Unified Judicial System resources were used in connection to the dispute. Sattizahn Testimony; Docket 149-1 ¶ 59. Instead, under the renovation project contract, the authority having jurisdiction over the renovation project is the Flandreau Santee Sioux Tribe. Docket 149-1 ¶ 41. Both the contract between Leo A. Daly and the Tribe and Henry Carlson Company and the Tribe include dispute resolution provisions that do not allow for South Dakota state court jurisdiction. *Id.* ¶ 61. Both contracts provide for disputes to be resolved by arbitration with enforcement of arbitration awards in

federal or tribal court. *Id.* Thus, no evidence was introduced that the project or
the parties used any resources from the South Dakota Unified Judicial System.

Similarly, State witnesses failed to identify any funding for services from
the Department of Health, the Office of the Governor, the Office of Economic
Development, the Office of Tribal Relations, the Department of Transportation,
the Department of Public Safety, the Department of Weights and Measures, the
Department of the Military, the Department of Veterans Affairs, the
Department of Energy and Natural Resources, the Department of Education,
the Department of Agriculture and Game, Fish, and Parks, and the Department
of Social Services, that were provided to the Tribe, tribal members, Henry
Carlson Company, or the Casino. *See* Williams, Liza Clark, Stoeser, Peterson,
and Tidball-Zeltinger Testimony. And evidence established that, to each State
witness's knowledge, no South Dakota government employee or official from an
agency funded by the State's general fund has ever visited the Reservation on
official business except one State parole agent. Doug Clark, Adams, Sattizahn,
Holwegner, Peterson, Tidball-Zeltinger, and Stoeser Testimony. Thus, the court
finds that the State has failed to show off-reservation services that were utilized
by the Tribe, tribal members, or Henry Carlson Company.

The State also argued that the Tribe, tribal members, or Henry Carlson
Company could take advantage of some more general services provided by the
State through agencies funded by the State general fund. For example, the
State argued that because the State conducts health inspections at fast food
restaurants, Henry Carlson Company and the Tribe benefitted from the service

if tribal workers or Henry Carlson Company employees stopped to eat off-reservation on the way to or from the renovation project. Williams Testimony. But the State presented no evidence that any such stops occurred off-reservation. The State also argued that it provides a Unified Judicial System that services cases out of Moody County and could service issues with the renovation project. Sattizahn Testimony. But evidence showed that under the renovation contract, the state court system lacks jurisdiction over any dispute related to the project and also lacks criminal jurisdiction over tribal members accused of committing on-reservation crimes. Sattizahn Testimony; Docket 149-1 ¶ 61; *see also* Ex. 24.

Based on this evidence, the court finds that the State has failed to establish the use of State services funded by the State general fund sufficient to justify the imposition of the State excise tax. *See Mescalero*, 462 U.S. at 336; *see also Video Gaming Tech.'s, Inc. v. Rogers Cty. Bd. of Tax Roll Corr.*, 2019 WL 6877909, at *9 (Ok. Dec. 17, 2019) (holding that a tax on the owner of gaming machines leased to a tribal casino, identical to the tax in *Mashantucket,* was preempted because the state failed to show that "it provide[d] any regulatory functions or services" to the Tribe or the off-reservation company "to justify its taxation of equipment"). The State has failed to establish evidence of the utilization of State services by Henry Carlson Company, the Tribe, or tribal members on-reservation and connected to the Casino renovation project. The State has also failed to establish evidence of the utilization of State services off-reservation by Henry Carlson Company, the Tribe, or tribal members. The State

provided hypothetical scenarios of State services that could be utilized, but failed to establish evidence of any actual utilization or any connection to the renovation project. Thus, the court "heavily discount[s]" the State services because of the absence of a specific "nexus between the [on-reservation renovation project] and the government function[s] provided." *Haeder*, 938 F.3d at 946-47 (citation omitted).

Finally, even if the Tribe or a tribal member did take advantage of one of the State services funded by the State general fund, the State is well-reimbursed for the services that are generally available to tribal members. The Tribe regularly pays taxes and fees to the State. On the renovation project itself, the tribe paid the State more than $56,000 in sales tax on material used by the contractors. *See* Ex. 179. The Tribe pays $80,000 per year in county property tax on non-trust land. Reider and Kills-A-Hundred Testimony. The Tribe spends thousands of dollars each year on vehicle fuel, all of which is subject to the state fuel tax. Kills-A-Hundred and McDermott Testimony; *see also* Ex. 38, 158; Docket 149-1 ¶ 63. The Tribe's on-reservation gas station generates nearly $300,000 per year in fuel tax, none of which is distributed to the Tribe. McDermott Testimony; Ex. 154. The Casino pays at least $35,000 annually in state unemployment taxes for all Casino employees, and the Tribe pays about $20,000 annually in state unemployment taxes for all tribal employees. Kills-A-Hundred Testimony; *see also* Docket 149-1 ¶ 65; Ex. 39, 158; Docket 152-18 at 10, 12, 31. As previously discussed the Casino pays the State's invoices for slot machine inspections conducted by the South Dakota

Gaming Commission. Docket 149-1 ¶ 66. And tribal members pay sales tax to purchase furniture, clothing, food, and other products off-reservation because there are no grocery, clothing, or furniture stores on the reservation. Reider Testimony.

The State also argued that employees of Henry Carlson Company alone could take advantage of any of the State services funded by the State general fund. But although the legal incidence of the tax falls on Henry Carlson Company, the company does not pay the tax, and the economic burden of the tax is on the Tribe. The Supreme Court noted in *Ramah* that "the state tax revenues derived from [the non-Indian contractor's] off-reservation business activities [were] adequate to reimburse the State for the services it provide[d]" to the non-Indian contractor off-reservation. 458 U.S. at 844 n.9. Much, like the reimbursement the Tribe provides the State in the form of other taxes, Henry Carlson company sufficiently reimburses the State for services the State provides in State tax revenue derived from the company's off-reservation business activities.

Evidence at trial showed that Henry Carlson Company has paid taxes in South Dakota for 101 years, and that nearly all of the company's projects are off-reservation, generating contractor's excise tax for the State. Derry Testimony. In 2019, the State collected over $1.2 million dollars in excise tax from Henry Carlson Company. Derry and Breck Testimony. Although the State failed to present evidence that Henry Carlson Company employees use State services funded by the general fund, the court finds the million dollars Henry

Carlson Company pays the State in excise tax is adequate to reimburse the State for any services provided to the company. *See* Derry Testimony; Ex. 80, 179; *see also Ramah*, 458 U.S. at 844.

The court finds the State submitted no evidence that the Tribe, tribal members, or Henry Carlson Company used off-reservation services that were provided by the State and funded by the State general fund. The court finds the general off-reservation services that were available for use by the Tribe, tribal members, or Henry Carlson Company are too attenuated and extraneous to the taxed activity–the Casino renovation project. The State is adequately reimbursed for these generalized off-reservation services by both the Tribe and Henry Carlson Company's tax payments. And much like *Ramah*, any off-reservation services provided to the non-Indian contractor, here, Henry Carlson Company, cannot serve as "a legitimate justification for a tax whose ultimate burden [fell] on the tribal organization." 458 U.S. at 844. The court finds that "the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax." *Id.* at 843. Thus, the court finds the State's interest in being reimbursed for State services is minimal, and does not weigh in favor of imposition of the excise tax.

### b. Raising Revenue for the General Fund

Next, the court considers the State's general interest in raising revenue. Under SDCL § 10-46A-1, a contractor's gross receipts are subject to a 2% excise tax. SDCL § 10-46A-1. Generally, a contractor's excise tax is deposited into the State of South Dakota's general fund. Docket 149-1 ¶ 48. In 2018,

South Dakota's contractor's excise tax collections rose by 7%. *Id.* ¶ 73. In 2018, South Dakota's approved budget was $4,807,134,211.00. *Id.* ¶ 74. In 2019, the State budget was $4,844,973,501. Adams Testimony; *see also* Ex. 180. Here, the Tribe estimates that the contractor's excise tax on the project will be approximately $384,436, or about $128,145 each year pro rata. Liza Clark, Stoeser, Sattizahn Testimony.

Evidence at trial showed that $384,436 is a small fraction of the total contractor's excise tax collected by the State, and an even smaller fraction of the State's general fund. In 2019, the State collected over $114 million dollars in contractor's excise tax. Adams Testimony; Ex. 180-81. This $114 million in contractor's excise tax was only 7% of the State's annual general fund revenue in 2019, which was about $1.7 billion dollars. Adams Testimony; Ex. 181. In fiscal year 2020, the State forecasts $119 million in contractor's excise tax, with a general fund of again nearly $1.7 billion dollars. Kills-A-Hundred Testimony; Ex. 181.

If the State collected the full contractor's excise tax of $384,436, the excise tax from the Casino renovation project would be 0.0226% of the $1.7 billion State general fund. *See* Ex. 181; *see, e.g.*, Stoeser, Holwegner, Tidball-Zeltinger Testimony. But because the contractor's excise tax imposed on the Tribe would not be collected in 1 fiscal year and instead would be spread pro rata over a 3 to 4 year period, the tax is an even smaller allocation to the general fund, making $128,145 less than 0.0076% of the general fund's $1.7 billion dollar contributions. Reider Testimony; *see* Ex. 181.

And the amount is smaller when divided between the agencies that receive revenue from the State general fund. State witnesses testified that the amount of contractor's excise tax at issue is negligible relative to each agencies' department budget. For example, evidence at trial showed that if the entire Tribe's excise tax payment of $384,436 was allocated to the South Dakota Department of Education budget in 1 fiscal year, the loss would be less than .02% to the agency's budget. Stoeser Testimony. If divided pro rata between 3 fiscal years at $130,000 per year, the loss would be "infinitesimal." Stoeser Testimony. Similarly, if the total Tribe excise tax payment of $384,436 was allocated to the South Dakota Department of Correction's budget in 1 fiscal year, it would be a .12% loss to the agency's overall budget. Doug Clark Testimony. If spread pro rata between 3 years, it would be far less. Doug Clark Testimony. For other agencies, if the pro rata $128,145 excise tax loss was allocated to each respective agency's budget: the Legislative Research Council would lose 1.9% of its total budget, the South Dakota Department of Agriculture would lose 1.8% of its total budget, the Department of Social Services would lose less than 0.01% of its total budget, the Unified Judicial System would lose less than .3% of its total budget. Holwegner, Peterson, Tidball-Zeltinger, and Sattizahn Testimony. This percentage is miniscule if the excise tax loss is spread amongst all general fund funded agency budgets. Thus, the court finds that the loss of the Tribe's excise tax would have a small impact to the State's budget, and more importantly, State agencies' budgets funded by the State general fund from a loss of the Tribe's excise tax.

89

The State argues that the court should not consider this argument because any taxpayer protesting a tax could similarly argue that their tax payment is a small percentage of the State budget or State general fund and thus never pay taxes. The court disagrees. This case requires that the court apply the *Bracker* analysis by balancing federal, state, and tribal interests. Within that analysis is consideration of the effect the excise tax has on the Tribe's budget and State's budget, and the reimbursement necessary to the State for any State government services. This court would not decide whether the State had authority to impose a tax on other taxpayers in the State with the same considerations analyzed under the *Bracker* balancing test. As such, the court does not discredit the insignificant impact of the renovation project's excise tax on the State budget and State general fund.

Based on the above-summarized evidence, the court finds that the State only demonstrated a general interest in raising revenue. Although the "regulatory interest of the State must be given weight," a "generalized interest in raising revenue" is insufficient to justify the tax. *Bracker*, 448 U.S. at 144, 150 (citation omitted). A "generalized desire to collect revenue" is not a proper justification for the imposition of a tax. *Ramah*, 458 U.S. at 845; *see also Mescalero*, 462 U.S. at 343 (finding that the state's "general desire to obtain revenues [was] simply inadequate to justify the assertion of [the tax]"). Much like *Noem*, based on the evidence introduced at trial, "this is not a case in which the State seeks to assess taxes in return for governmental functions it performs for those on whom the taxes fall." 938 F.3d at 937 (quoting *Bracker*,

448 U.S. at 150). Instead, as was demonstrated at trial, the State of South Dakota has a general interest in raising revenue to provide governmental services throughout South Dakota, not to generate revenue to provide specific services to the Tribe, tribal members, Henry Carlson Company, or the Casino, or be reimbursed for services provided. As demonstrated at trial, the loss to the general fund is miniscule, with a *de minimis* impact on State agency budgets funded by the State general fund. As noted in *Noem*, this general "interest in raising revenues to provide government services throughout South Dakota does not outweigh the federal and tribal interests in Class III gaming reflected in IGRA and the history of tribal independence in gaming[.]" *Id.* The State agencies funded by the general fund have failed to show a strong interest in the $128,145 excise tax pro rata distributed over 3 years. Thus, the court finds the State's general interest in raising revenue cannot justify the substantial burden on federal and tribal interests and weighs against imposition of the excise tax.

### c. Uniform Application of South Dakota Tax Law

Finally, the court considers the State's interest in the uniform application of South Dakota tax law. A State has an interest in " 'being in control of, and able to apply, its laws throughout its territory.' " *Haeder*, 938 F.3d at 946 (quoting *Mashantucket*, 722 F.3d at 476). The State's "interest is diminished where . . . the sole application of the state law at issue is on [a] Tribe's reservation, which occupies a unique status within the State." *Mashantucket*, 722 F.3d at 476.

For purposes of the imposition and assessment of a contractor's excise tax, the State of South Dakota deems the location of the contractor's services to be the location of the project. Docket 149-1 ¶ 47. There are few state statutory exemptions from the contractor's excise tax. Docket 147 ¶ 10. Tribes typically have 2 avenues when contesting taxation on construction projects within Indian country: (1) Tribes can enter into a tax agreement with the State, or (2) Tribes can apply for the project to be deemed exempt by the State. The State will not enter into a tax-collection agreement with a Tribe unless the Tribe has a tribal tax identical to the State tax. Adams Testimony. And as previously discussed, here, the Tribe does not impose a tribal contractor's excise tax because the Tribe owns all the buildings on the reservation. Reider and Kills-A-Hundred Testimony. Thus, the Tribe cannot take advantage of the first option and enter into a tax-collecting agreement with the State for the contractor's excise tax at issue. Adams Testimony.

Absent a tax collecting agreement, certain construction projects within Indian country are exempt from the contractor's excise tax under federal law. Docket 147 ¶ 11. The South Dakota Department of Revenue requires contractors to complete a "Request for consideration of Indian Use Only Projects" form to receive an exemption from the tax. In the past, the Department of Revenue has exempted the construction of tribal administration buildings, schools, health clinics, and housing within Indian country. Kills-A-Hundred and Adams Testimony. The decision on whether a project is exempt is based on a project-by-project determination by the Department of Revenue

using criteria developed by the Department, and is not determined based on a specific state law or regulation. Adams Testimony; *see also* Ex. 191, 195.

Here, Henry Carlson Company submitted a "Request for consideration of Indian Use Only Projects" for the Casino renovation project, which was denied by the Department. Ex. 196. The Tribe then submitted a second request for exemption, which was also denied by the Department. Ex. 189. The requests were denied by the Department of Revenue because the Department does not grant exemptions for work on commercial projects within Indian country. Adams Testimony; *see also* Ex. 189-91, 193-97.

On appeal, the Eighth Circuit found that "the State also has an interest in being able to apply its generally applicable excise tax throughout its territory." *Haeder*, 938 F.3d at 947 (citing *Mashantucket*, 722 F.3d at 475-76). At trial, Bobbi Adams testified at length that State taxes should be imposed in a fair and nondiscriminatory manner. But evidence demonstrated that the State does not uniformly apply the generally applicable excise tax throughout the State. The State has tax collection agreements with 7 of the Tribes located in South Dakota, none of which are the same. Adams Testimony. Depending on the tax agreement in place, an on-reservation construction project can be fully exempt from a State contractor's excise tax, partially exempt, or not exempt. Adams Testimony; *see, e.g.*, Docket 166-1 at 42-43. Within those agreements, 2 allocate 100% of the contractor's excise tax collection back to the Tribe. Adams Testimony; *see also* Ex. 182-88. The other 5 agreements allocate lesser shares of the excise tax back to the Tribes. Adams Testimony; *see also* Ex. 182-

88. Evidence showed that the other five Tribes that entered into a tax collection agreement with the State had a different tax rate percentage applied by the State to a tribal construction project.

For example, evidence demonstrated that the Sisseton Wahpeton Tribe was not obligated to pay State sales tax or State contractor's excise tax on its tribal casino renovation. Adams Testimony; *see also* Docker 166-1 at 51-52; Docket 175-2. Instead, Sisseton Wahpeton Tribe retained 77% of its use tax, and did not remit the 1% administrative fee for the use tax on a commercial business, Buffalo Lanes bowling alley. Adams Testimony; *see also* Docket 166-1 at 51-52; Ex. 188. In another example, the Yankton Sioux Tribe is not charged an administrative fee for the collection of the contractor's excise tax and does not remit any of the contractor's excise tax for construction at its tribal casino. Adams Testimony; Ex. 184. Thus, both the Sisseton Wahpeton Tribe and Yankton Sioux Tribe received 100% of the State excise tax back. *See* Ex. 184, 188. This evidence demonstrates a lack of uniformity in the application of contractor's excise tax in the State.

Evidence at trial also showed a lack of uniformity in the application of the State protocol and criteria when granting tax exemption requests in Indian Country. Instead, what Tribe receives an exemption and for what "commercial" activity depends largely on who is processing the application within the Department of Revenue at the time of the exemption request. For example, Bobbi Adams testified that it is typical Department of Revenue protocol to exempt taxes imposed on the construction or renovation of 4 categories: tribal

administration, education, health, and housing developments. Adams
Testimony; *see also* Ex. 191, 194-95. Adams testified that the Department of
Revenue denies any "commercial" construction activities unless it falls within
the 4 categories. Adams Testimony. But the Tribe presented evidence of a
variety of "commercial" construction projects that were exempted by the
Department but do not appear to fall within the Department's 4 categories,
most notably the Sisseton Wahpeton Tribal Casino. Adams Testimony; *see also*
Docket 166-1 at 102-115; Docket 175-2. Evidence at trial established that the
Sisseton Casino does not fit within one of the 4 categories, yet was granted an
exemption. These facts undermine the State's argument that it denies all
"commercial" construction projects, including casinos, that are not within the 4
categories.

And in addition to evidence that the Department exempted some
"commercial" construction activities that failed to conform to the 4 categories,
evidence showed the Department also failed to always categorically exempt
construction on tribal administration buildings. Here, the construction and
renovation of the Royal River Casino was completed in 2 phases: (a) phase 1
concerned the construction of the new administration building; and (b) phase 2
concerned renovation of the Casino. *See* Exhibit 197. In the Tribe's application
for an Indian Country exemption, the Tribe explained that the Casino
administration building would be used for tribal governance, such as tribal
council meetings. *See* Ex. 197. The Tribe noted that Phase I included
"[c]onstruction of a new administration building for the Royal River Casino

attached to the existing Royal River Casino building, to house all administrative offices for the operation. Those offices are also used for meetings of the Flandreau Santee Sioux Tribe at times." *Id.* at 5. The requests were denied by the Department of Revenue because the Department does not grant exemptions for work on "commercial" projects within Indian country. Adams Testimony; *see also* Ex. 189, 196-97. Thus, although phase 1 of the Casino renovation project fit within 1 of the 4 categories that are categorically exempt by the Department of Revenue, the Department denied the request. The court finds this to be additional evidence of a lack of uniformity in the application of the State's tax laws and procedures.

While the administration building in the Casino was denied an exemption for tribal governance, the Department has exempted a variety of other "commercial" construction projects on the basis of "tribal administration." For example, evidence demonstrated that the Department exempted the commercial installation of an electrical light pole at a powwow grounds because the tribe sometimes had meetings or administrative services at the powwow location. Adams Testimony; *see also* Docket 175-2 at 9. The Department exempted the Flandreau Santee Sioux Tribe community center because the building was sometimes used for tribal administrative purposes. Adams Testimony; *see also* Docket 175-2 at 9. Yet here, the exemption for the administration building at the Casino to be used for tribal administration was denied. Thus, the State does not uniformly apply its exemption criteria.

The State argues that it has a strong interest in construction projects that outweighs any federal or tribal interests. But as previously discussed, although the field of construction is not typically federally regulated, the contractor's excise tax necessarily impedes the clearly expressed federal interests in promoting tribal self-sufficiency, tribal self-governance, and ensuring the Tribe is the primary beneficiary of Indian gaming. For example, evidence established that the State exempts the construction of health clinics or schools in Indian country, yet the underlying regulation is the construction of said facilities. Just as a tax on the construction of a health clinic, tribal administration, or educational facility impedes the goals and administration of those entities, so too does the tax on the construction of a tribal casino impede the interests articulated in IGRA and the goals and administration of Indian gaming. Thus, much like the construction of schools in *Ramah* and highways in *Bracker*, the court does not find that the State's general regulation of the construction industry outweighs the tribal and federal interests in Indian gaming revenue.

Based on the evidence presented during the trial, the State has failed to show a strong interest in the uniform application of its tax laws and exemptions. Bobbi Adams testified that the Department of Revenue's goal is fairness and uniformity to ensure an even playing field for all taxpayers. Adams Testimony. But evidence at trial demonstrated that the State contractor's excise tax is not imposed by the Department in a fair and nondiscriminatory manner. In some instances, the State allowed a tribe to retain the full amount

of a contractor's excise tax imposed on the construction of tribal casinos, grocery stores, and bowling alleys. In other instances, the State exempted a tribe from paying a contractor's excise tax on "commercial" projects such as a powwow light pole or community center. Yet here, the State did not exempt the excise tax. This evidence of disparate treatment of Indian country construction projects undermines the State's interest in fair and indiscriminate tax application. The State has failed to show an interest in the uniform application of "its generally applicable contractor excise tax throughout the State[.]" *Haeder*, 938 F.3d at 947. Thus, the court finds the State's interest in uniform application of the contractor's excise tax is minimal and weighs against imposition of the excise tax.

### 4. Conclusion

In conclusion, the court finds that under a *Bracker* analysis, the State of South Dakota's interest in imposing the contractor's excise tax does not outweigh the tribal and federal interests in promoting tribal self-sufficiency and self-governance, ensuring the Tribe is the primary beneficiary of gaming, protecting gaming as a means of general tribal revenue, and securing tribal economic development. Considering all the *Bracker* factors, the evidence presented at trial demonstrated: (1) a strong historical backdrop of tribal sovereignty and sovereignty in the field of Indian gaming; (2) the federal regulatory scheme of IGRA is extensive; (3) there is a strong federal interest in the construction and maintenance of Indian gaming to protect the environment and public health and safety of Indian gaming facilities and patrons while

98

simultaneously promoting tribal self-sufficiency and strong tribal government
as evidenced by the statutory structure of IGRA; (4) the Tribe's own regulation
of gaming, gaming revenue and on-reservation construction is extensive; (5) the
economic burden of the State excise tax falls directly on the Tribe; (6) the State
excise tax places a substantial burden on the Tribe's ability to generate gaming
revenue and provide essential tribal governmental programs through the
Tribe's budget; (7) there is no nexus between the services or regulations funded
by the State general fund and provided by the State to the Tribe, tribal
members, or Henry Carlson Company and the Casino renovation project; (8)
any State services provided to the Tribe, tribal members, the Casino, or Henry
Carlson Company off-reservation are not connected to the Casino renovation
project and minimal; (9) the State does not uniformly apply the contractor's
excise tax or its Department procedures for Indian country tax exemptions; and
(10) the State provides little government services funded from the general fund
to the Tribe, tribal members, the Casino, or Henry Carlson Company; the State
does not uniformly apply the tax; and as a result, the State can only
demonstrate a general interest in raising revenue.

"State jurisdiction is preempted by the operation of federal law if it
interferes or is incompatible with federal and tribal interests reflected in federal
law, unless the state interests at stake are sufficient to justify the assertion of
state authority." *Mescalero*, 462 U.S. at 334 (citing *Bracker*, 448 U.S. at 145).
In both *Bracker* and *Ramah*, the Supreme Court held that state taxes were
preempted where the State did not provide a "specific, legitimate regulatory

interest" in the taxed activity, *Ramah*, 458 U.S. at 843, and instead demonstrated only a "generalized interest in raising revenue" which was insufficient to "intru[de] into the federal regulatory scheme." *Bracker*, 448 U.S. at 150. The Eighth Circuit held the same in *Noem*. 938 F.3d at 937. Here, the State's interests are far from sufficient to justify the excise tax, and that impedes the strong federal and tribal interests at stake. Thus, under the *Bracker* balancing test, the court finds that the imposition of the State excise tax is preempted by federal law. The court also finds that based on the Department of Revenue's own criteria, at a minimum, the administration building at the Casino is exempted from the State excise tax because it falls within 1 of the 4 exempt categories.

### D. Express Preemption Under Indian Trader Statutes[6]

The Indian Trader Statutes, 25 U.S.C. §§ 261 to 264, state:

§ 261. Power to appoint traders with Indians

The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.

§ 262. Persons permitted to trade with Indians

Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the

---

[6] At the summary judgment phase, this court did not reach the Indian Trader Statutes issue. Docket 102 at 21.

Commissioner of Indian Affairs[7] may prescribe for the protection of said Indians.

§ 263. Prohibition of trade by President

The President is authorized, whenever in his opinion the public interest may require the same, to prohibit the introduction of goods, or of any particular article, into the country belonging to any Indian tribe, and to direct all licenses to trade with such tribe to be revoked, and all applications therefor to be rejected. No trader to any other tribe shall, so long as such prohibition may continue, trade with any Indians of or for the tribe against which such prohibition is issued.

§ 264. Trading without license; white persons as clerks

Any person other than an Indian of the full blood who shall attempt to reside in the Indian country, or on any Indian reservation, as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of $500[.]

The BIA promulgated regulations under the Indian Trader Statutes that are codified at 25 C.F.R. §§ 140.1-140.26 (2019). Trading is defined by the federal regulations as "buying, selling, bartering, renting, leasing, permitting and any other transaction involving the acquisition of property or services." 25 C.F.R. § 140.5(a)(6).

"[F]rom the very first days of our Government, the Federal Government had been permitting . . . Indians largely to govern themselves, free from state interference[.]" *Warren Trading Post Co.*, 380 U.S. at 687. In doing so, Congress authorized "sweeping" and "comprehensive federal regulation" over individuals seeking to trade with Indians and Indian tribes. *Id.* at 687-88.

---

[7] The Secretary of the Interior now exercises this authority. Reorganization Plan Number 3 of 1950, 15 Fed. Reg. 3174 (May 25, 1950).

Initially, the Supreme Court interpreted the Indian Trader Statutes very broadly, finding that whenever a product is bought, sold, or leased by a tribe within the reservation, state taxes may not be applied. *See Warren Trading Post Co.*, 380 U.S. at 690-91. In *Warren Trading Post*, the Supreme Court held that the Indian Trader Statutes prevented Arizona from imposing a 2% tax on the income or gross sales proceeds of licensed Indian traders trading with Indians, reasoning that "[t]hese apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." *Id.* at 690. Thus, Arizona's tax "frustrate[d] the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts." *Id.* at 691. Although *Warren Trading Post* suggests "that no room remains for state laws imposing additional burdens upon traders," the case involved transactions with Indians in Indian country as opposed to transactions with non-Indians. *Id.* at 690-92.

In 1980, the Supreme Court expanded on *Warren Trading Post* in *Central Machinery Co. v. Arizona State Tax Commission*, holding that Indian Trader Statutes preempted state taxation where the non-Indian trader had no business location on the reservation and did not possess an Indian trader license. 448 U.S. at 162. In *Central Machinery*, a non-Indian Arizona corporation sold 11 tractors to a tribal company, delivering the tractors to the

tribal company on-reservation. *Id.* at 161, 166. The state sought to impose a tax against the non-Indian seller, thereby increasing the price paid by the Tribe. *Id.* at 161-62. The Supreme Court noted that *Central Machinery* differed from *Warren Trading Post* in two ways: Central Machinery was not a licensed Indian trader and it did not have a permanent place of business on the reservation. *Id.* at 164. But the Court reasoned that, under the Indian Trader Statutes, the "transaction is plainly subject to federal regulation." *Id.* The Supreme Court found that the state could not tax the transaction "[u]ntil Congress repeals or amends the Indian Trader statutes" because the Court "must give [the Statutes] 'a sweep as broad as [their] language' . . . and interpret them in light of the intent of the Congress that enacted them[.]" *Id.* at 166 (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)). Thus, the Supreme Court found that "[i]t is the existence of the Indian Trader statutes, . . . not their administration, that preempts the field of transactions with Indians occurring on reservations." *Id.* at 165.

In *Department of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.*, the Supreme Court clarified that its prior holdings on the Indian Trader Statutes were limited to taxes imposed on Indian traders for on-reservation trading with Indians and not a tax applied to trading with non-Indians on-reservation. 512 U.S. 61, 74-76 (1994). The Court held that "[a]lthough language in *Warren Trading Post* suggests that no state regulation of Indian traders can be valid, our subsequent decisions have undermined that proposition." *Id.* at 71 (internal quotation omitted).

103

In *Milhelm*, New York imposed a series of regulations to "limit the quantity of untaxed cigarettes that wholesalers may sell to tribes and tribal retailers." *Id.* at 66. New York's regulations were designed to impose a cigarette tax "on non-Indian purchasers of goods that are merely retailed on a reservation" and the Court reasoned that "the States have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations[.]" *Id.* at 73. The Court in *Milhelm* heavily relied on its previous decisions in *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463 (1976), and *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134 (1980). In *Moe*, the Court held that Montana could require Indian retailers on the reservation to collect tax on the cigarettes sold to non-Indians. *Moe*, 425 U.S. at 483. And in *Colville*, the Supreme Court upheld Washington's cigarette and sales tax on purchases made by non-Indians on the reservation. *Colville*, 447 U.S. at 155-57. The Court stated that "Washington's taxes are reasonably designed to prevent the Tribes from marketing their tax exemption to nonmembers," and that "[t]he Indian traders statutes incorporate a congressional desire comprehensively to regulate businesses selling goods to reservation Indians for cash or exchange, but no similar intent is evident with respect to sales by Indians to nonmembers of the Tribe." *Id.* at 155-57 (citations omitted).

The Court explained that the state law found to be preempted in *Warren Trading Post* "was a tax directly 'imposed upon Indian traders for trading

with Indians . . . That characterization does not apply to regulations designed
to prevent circumvention of 'concededly lawful' taxes owed by non-
Indians." *Milhelm*, 512 U.S. at 74–75 (citations omitted). The Court
distinguished cases where a state sought to "prevent circumvention of"
otherwise lawful taxes from cases where a state sought to tax a trade between
an Indian trader and a Tribe. The former is permissible and is not preempted,
but the latter is preempted under the Indian Trader Statutes. If the former,
"depend[ing] on 'rigid rule[s]' or on 'mechanical or absolute conceptions of state
or tribal sovereignty,' " the court must engage in " 'a particularized inquiry into
the nature of the state, federal, and tribal interests at stake . . . to determine
whether, in the specific context, the exercise of state authority would violate
federal law.' " *Id.* at 73 (quoting *Bracker*, 448 U.S. at 142, 145). Thus, the
Supreme Court concluded "Indian traders are not wholly immune from state
regulation that is reasonably necessary to the assessment or collection of
lawful state taxes." *Id.* at 75.

The Tribe argues that in *Central Machinery*, the Supreme Court found
that the Indian Trader Statutes expressly preempt gross receipt taxes on Indian
traders trading with a Tribe, regardless of whether the non-Indian trader has a
BIA federal Indian trader license. *See* Docket 177 at 11 (citing *Central
Machinery*, 448 U.S. at 164-66). The Tribe argues that the Indian Trader
Statutes thus bar any regulation in "the field of transactions with Indians
occurring on reservations." *Central Machinery*, 448 U.S. at 165.  The Tribe
contends that federal law still preempts "a tax directly 'imposed upon Indian

traders for trading with Indians.' " Docket 177 at 11 (quoting *Milhelm*, 512 U.S. at 74-75). The Tribe argues that the Supreme Court has only permitted states to regulate trade transactions in Indian county when the collection of the tax is from non-Indian consumers. *Id.*

Here, the Tribe is not marketing a tax shelter from the excise tax to Henry Carlson Company. Instead, as in *Central Machinery*, Tribe entered into a contract to purchase goods and services from Henry Carlson Company in exchange for payment that would occur regardless of a state tax exemption. This case is distinguishable from the facts of *Milhelm*, *Moe*, and *Colville*, because it is not a transaction that ultimately involves a non-Indian consumer. *See* 512 U.S. at 73-75; 425 U.S. at 483; 447 U.S. at 155-56.

The State relies on the Tenth Circuit's previous decisions giving little weight to the Indian Trader Statutes. In a factually similar case, *Mescalero Apache Tribe v. O'Cheskey*, New Mexico imposed its gross receipts tax on contractors who had renovated a resort for the Mescalero Apache Tribe on the reservation. 625 F.2d 967, 968 (10th Cir. 1980) (en banc). The Tenth Circuit reasoned that "[t]he tax is on the contractor and on the privilege of doing business in New Mexico." *Id.* at 970. It distinguished the tax from the one in *Warren Trading Post* stating that the tax in *Warren Trading Post* "was imposed directly on the seller" as opposed to being imposed on the non-Indian buyers and the trader in *Warren Trading Post* was licensed. *Id.* at 971. It is important to note that *O'Cheskey* was decided on June 5, 1980, whereas *Central Machinery* and *Bracker* were not decided until June 27, 1980. But the Tenth

106

Circuit later reaffirmed its *O'Cheskey* decision in *Sac & Fox Nation of Missouri v. Pierce*, 213 F.3d 566 (10th Cir. 2000).

In *Sac & Fox Nation of Missouri v. Pierce*, Kansas imposed a motor fuel tax on all fuel distributors for the sale or delivery of fuel in the state. *Id.* at 569. Three Indian tribes, who owned and operated gasoline stations on trust land, argued that the Indian Trader Statutes prevented Kansas from imposing the tax on fuel purchases the tribes made of motor fuel from their motor fuel distributors. *Id.* at 580. The Tenth Circuit found that the Kansas motor fuel tax was not inconsistent with the Indian Trader Statutes because the "law [did] not impose a tax upon retail traders for trading with Indians." *Id.* at 582 (citing *Milhelm*, 512 U.S. at 74). Instead, the law is "a non-discriminatory tax on all wholesale fuel distributors for fuel distributions" and the distributors did not exclusively or significantly distribute all their fuel to the tribes. *Id.* at 583.

This court finds the Tenth Circuit's narrow reading of *Milhelm* unpersuasive. The Supreme Court in *Milhelm* distinguished between state laws and regulations that sought to prevent non-Indians from circumventing state taxes by doing business with Indians and state laws that taxed transactions between Indians and non-Indians. It did not find, as the Tenth Circuit reasoned, that any non-discriminatory law that applies to all potential traders is not preempted and only laws that specifically target transactions between Indians and non-Indians are preempted. The Tenth Circuit's reading would effectively repeal the Indian Trader Statutes, as most non-Indian traders engage in transactions with both Indian and non-Indians. Thus, the court does

107

not adopt the Tenth Circuit's reading of *Milhelm* and finds that the Indian Trader Statutes preempt the State's excise tax.

The State argues that the Indian Trader Statutes do not apply to the sale of construction materials and services to Indians on-reservation because services are not "trade" within the meaning of the statute. The State argues that because the Indian Trader Statutes only mention regulating goods, that Congress clearly intended trading to refer to goods and not services. For example, § 261 provides that the Commissioner "shall have the sole power and authority to appoint traders . . . and to make such rules and regulations . . . specifying the kind and quantity of goods[.]" 25 U.S.C. § 261.

But this transaction did not involve the sale of services only. It involved the Tribe's purchase from Henry Carlson Construction of millions of dollars of construction materials, including for example: structural steel, casework, doors, frames, hardware, signage, appliances, restroom specialties, roofing, glass, ceramic tile, and flooring. *See* Exhibit 64. "In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.' " *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). The ordinary meaning of "goods" would include the Tribe's purchase of millions of dollars of construction materials and as a result the Indian Trader Statutes apply.

South Dakota's law states that the contractor's excise tax is imposed on the contractor's gross receipts from "all labor and materials." SDCL § 10-46A-3. As such, the tax at issue is not only imposed on the construction services that

were provided by Henry Carlson Company to the Tribe, but also on the
"materials" or "goods" that were included in the contract. A narrow
interpretation of "trade" that excluded labor or service and only included the
trade of goods would not promote the congressional objectives of the Indian
Trader Statutes.

Even if this is construed to be a contract for services only, the court finds
that the State's ability to impose a contractor's excise tax on goods and services
provided on-reservation to the Tribe would be preempted by the Indian Trader
Statutes. Statutes passed for the benefit of Indian tribes "are to be construed
liberally in favor of the Indians, with ambiguous provisions interpreted to their
benefit[.]" *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see
also Chickawsaw Nation v. United States*, 534 U.S. 84, 93-94 (2001). The
Supreme Court noted that Indian Trader Statutes should be afforded "broad"
construction in *Central Machinery*. 448 U.S. at 166. In *Worcester v. Georgia*,
the Supreme Court interpreted the Indian Trade and Intercourse Act of 1832 as
regulating all intercourse with Indians in their territory, thus including services
and goods. 31 U.S. 515, 556-57 (1832).  And the Supreme Court analyzed the
word "trade" in an Indian treaty, stating that "trade" refers not only to "the
purchase and sale or exchange of goods and commodities," but also "other
recognized forms of business enterprise which do not necessarily involve
trading merchandise." *Jordan v. Tashiro*, 278 U.S. 123, 127-28 (1928).

Because Congress granted the Department of the Interior with "the sole
power and authority" to enforce the Indian Trader Statutes, the Department's

109

interpretation is accorded *Chevron* deference. 25 U.S.C. § 261; *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) ("[T]he rule must be promulgated pursuant to authority Congress has delegated to the official" to receive *Chevron* deference.). In *Chevron v. Natural Resources Defense Counsel*, the Supreme Court held that the proper judicial review of an agency's construction of its own statute is to ask two questions. 467 U.S. 837, 842 (1984).

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842-43.

Here, the Department of Interior has explicitly interpreted "trading" to "mean[] buying, selling, bartering, renting, leasing, permitting and any other transaction involving the acquisition of property or services." 25 C.F.R. § 140.5; *see* 49 Fed. Reg. 25,433 (June 21, 1984). Merriam-Webster's Collegiate Dictionary defines "trade" generally as "to have dealings," and "to do business with." *Trade*, Merriam-Webster Collegiate Dictionary (11th ed. 2014).

Applying a general definition of traders and trading that would include services, the statute still makes sense. It would read that the Commissioner may appoint traders trading in goods and services and make rules regarding the types of goods the traders may sell. Similarly, a general definition of

"trading" and "trader" that would include dealing in goods and services would make sense in sections 262, 263, or 264. Thus, because both a general definition of trading that includes dealing in services and a definition more narrowly defined to dealing goods would "mak[e] some sense under the statute[] itself indicates that the statute is open to interpretation." *Nat'l R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, 418 (1992).

Next, the court must consider whether the Department of the Interior's construction is reasonable. "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]" *Chevron*, 467 U.S. at 844. As the Supreme Court has noted, the purpose of the Indian Trader Statutes was to prevent "fraud and imposition" upon the Indian tribes. *Central Machinery*, 448 U.S. at 163 (quoting H.R. Rep. No. 23-474, at 95 (1834)). Because the trade in services presents as much of a risk of fraud as trade in goods, the Department of Interior's interpretation of "trading" to include the trade of services is "a reasonable policy choice for the [Department] to make[.]" *Chevron*, 467 U.S. at 845.

As such, the court finds that Indian trader statutes must be broadly and liberally construed in favor of Indians. In doing so, excluding service transactions would not be consistent with this broad construction nor the purpose of the statutes to protect Indians from fraud and deceit in transactions. And Department of Interior controlling regulations have expressly interpreted Indian Trader Statutes and related acts of Congress to include

111

trade in services, specifically 25 C.F.R. § 140.5, defining "trade" to mean "involving the acquisition of property or services."

Here, South Dakota law states that the contractor's excise tax is imposed on the contractor's gross receipts from "all labor and materials." SDCL § 10-46A-3; *see also* Adams Testimony; Docket 166-2 at 34. As such, the tax at issue not only is imposed on the "services" provided by Henry Carlson Company to the Tribe, but also the "materials" or "goods" used in the service. A narrow interpretation of "trade" that excluded "service" or "labor" transactions and only included the trade of goods would not promote the congressional objectives of the Indian Trader Statutes. Thus, the court finds that the term "trade" as used in the Indian Trader Statutes includes the sale of construction materials and services to Indians on-reservation. Thus, the Indian Trader Statutes expressly preempt the State contractor's excise tax at issue here.

### E. Preemption Under *Bracker* Test- Indian Trader Statutes

Even if the Indian Trader Statutes do not expressly preempt the tax at issue, the court must engage in the *Bracker* balancing test, cognizant again of the federal, tribal, and state interests implicated by the Indian Trader Statutes. *Milhelm*, 512 U.S. at 73-75 (citing *Bracker*, 448 U.S. at 142).

### 1. Federal and Tribal Interests

The court incorporates the discussion on the federal and tribal interests above. Although many of the same federal and tribal interests previously discussed are parallel to the federal and tribal interests under the Indian Trader Statutes, the court finds some additional facts are significant. The

express objective of the Indian Trader Statutes is "the protection of said Indians." 25 U.S.C. § 262. The "evident congressional purpose" remains "ensuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations except as authorized by Acts of Congress or by valid regulations promulgated under those Acts." *Warren Trading Post*, 380 U.S. at 691. Recently in 2016, the Department of the Interior requested public comment on proposed revisions to the regulations that implement the Indian Trader Statutes. Traders With Indians, 81 Fed. Reg. 89015 (Dec. 9, 2016). Within the notice, the Department noted the importance of Congress's grant of "broad and comprehensive authority to regulate trade in Indian Country" to "promote economic viability and sustainability in Indian Country." *Id.* at 89016. The notice also commented on "dual taxation on Tribal lands," noting that state taxes "can undermine the Federal policies supporting Tribal economic development, self-determination, and strong Tribal governments." *Id.* The Department stated, "[d]ual taxation of traders and activities conducted by traders . . . can impede a Tribe's ability to attract investment to Indian lands where such investment and participation are critical to the vitality of Tribal economies." *Id.*

Much like the federal regulatory scheme of IGRA, the Indian Trader Statutes provide an additional source of federal regulation over the renovation project. The statutes subject every individual trading with Indians on-reservation to federal licensing and regulation requirements. At trial, testimony established that the BIA delegates the responsibility for regulating on-

113

reservation trade to tribes. Kills-A-Hundred Testimony. Based on this delegation, the Tribe requires licenses for any person or entity doing business on the reservation. Kills-A-Hundred Testimony; *see, e.g.*, Ex. 37. The State does not regulate who can or cannot engage in business on-reservation and does not issue business licenses authorizing on-reservation trade. Adams Testimony. This statutory scheme is similar to the practices under IGRA, where Tribes are provided the regulatory authority, advancing federal interests while simultaneously promoting tribal self-sufficiency and self-governance.

Here, evidence established that the Tribe required Henry Carlson Company, Leo A. Daly, and the subcontractors to the renovation project to hold and maintain tribal business licenses. Kills-A-Hundred Testimony; *see, e.g.*, Ex. 37. And as discussed at length above, the State did not issue a business license to these entities. In addition to the business licenses, the contract for the trade of these services was negotiated and executed on the reservation. Docket 149-1 ¶ 60; *see also* Derry Testimony. The contract included the cost of services, construction materials, permits, and all costs to complete the renovation project. *See* ex. 24; 179. This lack of State regulation of business on the Reservation is also evidence of the tribal interests in tribal sovereignty and independence in dealing with traders who sell goods and services to the Tribe.

And although the BIA did not draft or approve the renovation project's loan documents, evidence was presented of federal involvement in the review of the financing agreements. Docket 147 ¶ 18; Docket 149-1 ¶ 76. The Tribal Gaming Commission required a review of the above financing agreements by

114

the National Indian Gaming Commission General Counsel to ensure the financing agreements did not constitute a management contract. Docket 149-1 ¶ 76. This review was completed in July of 2018. *Id.* No State review of the finance agreements was shown at trial.

The contractor's excise tax also impedes both the federal and tribal interests in economic development and fair dealing as well as the federal and tribal interests in protecting the Tribe by monitoring and regulating its commercial partners. The Tribe has an interest in engaging in commerce on-reservation that is free from direct economic burdens, except those authorized by the Tribe or Congress who alone are provided the responsibility to govern such transactions. Here, the purpose and objectives of the Indian Trader Statutes are frustrated by the State excise tax on a non-Indian trader's gross income from selling to Indians on the reservation. The tax "put[s] financial burdens on [the non-Indian trader] or the Indians with whom [the trader] deals in addition to those Congress or the [Tribe] have prescribed." *Warren Trading Post*, 380 F.3d at 691. In doing so, the tax "could thereby disturb and disarrange the statutory plan Congress set up in order to protect Indians against prices deemed unfair or unreasonable[.]" *Id.* Thus, the court finds that the Indian Trader Statutes reflect both a federal and tribal interest in ensuring that Tribes are not subjected to unfair or deceitful transactions.

In some cases, federal and tribal interests are not strongly implicated by a state tax. For example, the Supreme Court found that neither the tribe's interests in economic development and fair dealing nor the federal interests in

115

protecting the tribe by monitoring and regulating its commercial partners were implicated by Washington's generally applicable personal property tax. *See Colville*, 447 U.S. at 156–57. This sentiment was particularly true in *Mashantucket*, where the Second Circuit found that "the incidence of the generally applicable tax falls on the non-Indian's *ownership of property,* rather than on the *transaction* between the Tribe and the non-Indian. 722 F.3d at 469 (emphasis in original). The Second Circuit noted that "Indian trader law 'pre-empts the field of *transactions* with Indians.' " *Id.* (quoting *Cent. Mach. Co.,* 448 U.S. at 165 (emphasis in original)). Here, unlike *Colville* or *Mashantucket*, the tax imposed on the non-Indian trader is not based on the ownership of property or the valuation of the land, but rather on the transaction between the Tribe and the non-Indian trader for goods and services. South Dakota law states that the contractor's excise tax is imposed on the contractor's gross receipts from "all labor and materials." SDCL § 10-46A-3; *see also* Adams Testimony; Docket 166-2 at 34. Thus, because "Indian trade law 'pre-empts the field of transactions with Indians,' " the court finds the transaction here distinguishable from *Colville* and *Mashantucket*. 722 F.3d at 469 (quoting *Cent. Mach. Co.*, 448 U.S. at 165).

Also, unlike other cases, the taxed "transaction" in this case does not take place off-reservation but rather on-reservation. For example, in *Pierce*, the Tenth Circuit Court of Appeals held that the Indian Trader Statutes did not preempt a Kansas state motor vehicle fuel tax imposed on fuel distributors located off-reservation. 213 F.3d at 582-83. Unlike *Pierce*, the State

contractor's excise tax here is imposed on the on-reservation transaction with the Tribe. And like the facts of *Central Machinery Co.*, it is not "relevant that [Henry Carlson Company] did not maintain a permanent place of business on the reservation." 448 U.S. at 165. As such, the tax implicates the Indian Trader Statutes' federal objectives summarized above as compared to transactions located off-reservation.

The State also argued at trial that the tribal and federal interests are minimal in this case because Henry Carlson Company lacked a federally-issued BIA license to trade with the tribe. The court disagrees. The Supreme Court rejected this argument in *Central Machinery*, holding that "[i]t is irrelevant that [the vendor] is not a licensed Indian trader." 448 U.S. at 164. Even so, the State further argues that the lack of a federal Indian trader license would have proven fatal to the claim in *Central Machinery* if the BIA had not approved the sale. The State argues that it does not matter that the BIA seldom issues licenses.

As the Supreme Court noted in *Central Machinery*, it is not the administration of Indian trader statutes, but the statutes' "existence . . . that pre-empts the field of transactions with Indians occurring on reservations." 448 U.S. at 165. And as was recently highlighted by the Supreme Court in *McGirt v. Oklahoma*, the conformity of historical practices to a federal statute are "a meaningless guide for determining" Congressional intent. 140 S. Ct. at 2471. The State also argues that in *U.S. ex rel. Keith v. Sioux Nation Shopping Center*, sellers operating on-reservation without federal Indian traders' licenses did not

violate 25 U.S.C. § 264. 634 F.2d 401 (8th Cir. 1980). But in *Keith*, the court held that operating without an Indian traders' license did not violate 25 U.S.C. § 264 because it was impossible for the vendors to obtain a BIA license and instead the vendors obtained permits from the tribe. *Id.* at 403. Thus, the court finds that the lack of a federal license does not weigh against the federal interests and objectives found in the Indian Trader Statutes.

Based on the discussion of federal and tribal interests discussed above, and incorporating the federal and tribal interests under IGRA that coincide with the federal and tribal interests under the Indian Trader Statutes, the court finds the federal and tribal interests weigh against imposition of the State excise tax.

### 2. State Interests

Incorporating the State's interests discussed at length under IGRA, when again weighing the State's interests against the federal and tribal interests implicated by the Indian Trader Statutes, the result is the same. The imposition of the State contractor's excise tax on an Indian trader directly interferes with federal and tribal interests under the Indian Trader Statutes. Much like the facts of *Warren Trading Post*, as discussed above, here, there is a complete lack of State responsibility on the reservation when it comes to Indian commerce. *See* 380 U.S. at 690-91. Thus, the court finds the State's interests do not outweigh the burden the tax imposes on the federal and tribal interests.

### 3. Conclusion

In conclusion, the court finds that under a *Bracker* analysis, the State of South Dakota's interest in imposing the contractor's excise tax does not outweigh the tribal and federal interests. Considering all the *Bracker* factors, the evidence presented at trial demonstrated: (1) a strong historical backdrop of tribal sovereignty and sovereignty in the field of Indian trading; (2) a strong federal interest in Indian trading, as evidenced by 25 U.S.C. §§ 261-64; (3) the Tribe's own regulation of business licenses and trading goods and services with the Tribe is extensive; (4) the economic burden of the State excise tax falls on the Tribe; (5) the State excise tax places a burden on the Tribe's ability to generate gaming revenue, commerce, and trade; (6) there is no nexus between the services or regulations funded by the State general fund and provided by the State to the Tribe or Henry Carlson Company and the taxed service of the Casino renovation project; (7) any State services provided to the Tribe, tribal members, the Casino, or Henry Carlson Company off-reservation are not connected to the renovation project and are minimal; and (8) that because the State provides little government services funded from the general fund to the Tribe, tribal members, the Casino, or Henry Carlson Company, and the State does not uniformly apply the tax, the State can only demonstrate a general interest in raising revenue.

Here, the contract between Henry Carlson Company and the Tribe was executed on-reservation, the services contracted for were completed on-reservation, and all other contractual obligations were effectuated on-

reservation. Under the Indian Trader Statutes, 25 U.S.C. §§ 261-264, the transaction is subject to federal regulation. *See Cent. Mach. Co.*, 448 U.S. at 164. "It is the existence of the Indian [T]rader [S]tatutes . . . and not their administration, that pre-empts the field of transactions with Indians occurring on reservations." *Id.* at 165. "Until Congress repeals or amends the Indian trader statutes," this court "must give them 'a sweep as broad as [their] language[.]" *Id.* at 166 (second alteration added) (quoting *United States v. Price*, 383 U.S. 787, 801 (1966)). Thus, "[b]ecause Congress has not said otherwise, [the court] hold[s] the government to its word." *McGirt*, 140 S. Ct. at 2459.

## CONCLUSION

The South Dakota contractor's excise tax on Henry Carlson Company's gross receipts derived from the on-reservation construction and renovation of the Royal River Casino is not per se invalid nor expressly preempted under IGRA. After considering the federal, tribal, and state interests under the *Bracker* balancing test, the court finds that the tax interferes with federal and tribal interests reflected in IGRA. This outweighs the State's minimal interests. Thus, the State tax is preempted under IGRA.

Additionally, because Congress has not said otherwise, Indian Trader Statutes expressly preempt the contractor's excise tax. In the alternative, even if the Indian Trader Statutes do not expressly preempt the State tax, after considering the federal, tribal, and state interests under the *Bracker* balancing test, the court finds that the tax interferes with federal and tribal interests reflected in the Indian Trader Statutes. This outweighs the State's minimal

interests. Thus, the State tax is preempted under the Indian Trader Statutes. Because the State's interests do not outweigh the strong federal and tribal interests under IGRA or the Indian Trader Statutes, the State contractor's excise tax is preempted under federal law. Thus, it is

ORDERED that judgment will be entered in favor of plaintiff, Flandreau Santee Sioux Tribe, and against defendants, James Terwilliger and Kristi Noem, in accordance with this memorandum opinion and order.

Dated October 21, 2020.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE